OPINION. Raum, Judge: Respondent allocated to petitioners a portion of the income of a third business entity, Killashun Sales -Division, and the principal question is whether that action was authorized by section 45 [4] or the general provisions of section 22 (a) of the Internal Revenue Code. On the answer depends petitioners’ liability for the largest part of the income, excess profits, and declared value excess-profits taxes respondent determined to be due from them for 1942,1943, and 1945. Petitioners L. E. Shunk Latex Products, Inc., and The Killian Manufacturing Company, to which we also refer as “Shunk” and “Killian,” respectively, were two corporations engaged in the manufacture of rubber prophylactic articles. Prior to 1937, as major producers, they vigorously competed with each other, often at a loss of profit to both. The adverse effect of Shunk’s competition on Killian’s business caused a reduction in the royalties paid by Killian on certain patents it was licensed to use in its manufacturing operations, and, spurred by the decline in these royalties, the holder of the patents in 1935 brought suit against Shunk for infringement. The suit was settled in June 1937, on the basis of an agreement which provided for the following: grant of a license to Shunk under one of these patents; minimum prices at which Shunk and Killian were to sell their products ; and formation of another business entity to or through which both Shunk and Killian would dispose of their entire output. This agreement was put into effect, and, at first, an organization called Killashun Agency was formed, but shortly after its creation it was superseded by another and distinct organization, a partnership named Killashun ¿Sales Division, which will be referred to as “Killashun.” Thereafter Shunk and Killian sold all their products to Killashun, which Killashun in turn resold on its own account. This arrangement, between petitioners and Killashun, grew out of arm’s length negotiations between petitioners and owners of the patents under which Killian operated. In 1937, when the arrangement was entered into, Shunk, Killian, and Killashun were separate businesses, not subject to common ownership or control. By the end of 1939, however, three persons, Maurice Gusman, Charles E. Jenkins, and James L. Tyrrell, Jr., who had been the partners in Killashun since its organization and who controlled its operations if not also its ownership, acquired control of Shunk and Killian as well. Petitioners contend that Gusman, Jenkins, and Tyrrell did not control Shunk, Killian, and Killashun after 1939 because there were other interests in the businesses. These are alleged to consist, first, of the wives of these three persons, who purportedly became partners in Killashun; and, secondly, of the beneficiaries of a trust, of which Tyrrell was trustee, which owned stock in Killian. Even if the wives are recognized as partners in Killashun, ownership of the three businesses to a large degree was still in Gusman, Jenkins, and Tyrrell. Furthermore, common control is not excluded merely because there is variation between some of the owners of proprietorship interests in related businesses. “The term ‘controlled’ includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise.” Treasury Regulations 111, sec. 29.45-1 (a) (3). Cf .Grenada Industries, Inc., 17 T. C. 231, 254. Gusman, Jenkins, and Tyrrell held important positions in these businesses, fixed their policies, and had complete authority over their operations. The record leaves it clear that all three organizations, during the years -in issue, were “owned or controlled directly or indirectly by the same interests.” Allocation between controlled businesses of “gross income, deductions, credits or allowances” is permitted under section 45 of the Code where “necessary in order to prevent evasion of taxes, or clearly to reflect the income of any of such organizations, trades, or businesses.” Section 45 empowers the Commissioner to act to rectify abnormalities and distortions in income which come about through the common control to which separate taxpaying entities may be subject. “The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer.” Treasury Regulations 111, sec. 29.45-1 (b). Using this standard, we think respondent erred in allocating to Killashun any income of petitioners. The premise on which respondent’s allocation was constructed, that Killashun was acting as an agent of petitioners, following an agreement they had made earlier with Killashun Agency, is contrary to the facts as we find them, and cannot, in our opinion, support a redistribution of Killashun’s income. While there were other circumstances described herein, which establish a clear diversion of petitioners’ income to Killashun, they too seem to us to be unavailable to support corrective action under section 45 for reasons which we shall discuss presently. No other basis appearing on which to sustain respondent’s allocations, our ruling on this issue must be for petitioners. The agreement between petitioners and Killashun Agency provided that the latter was to sell petitioners’ products as their agent, and, from the proceeds of sales, was to retain as compensation a specified amount for each gross of their product sold, remitting the remainder to petitioners. It was not long, however, before that agreement was replaced, and it did not govern at all petitioners’ relations with Killa-shun Sales Division. The latter bought and sold on its own account; it was not “compensated” by petitioners; and the proceeds of sales made by it were not the property of petitioners, to be surrendered to them. The arrangement between petitioners and Killashun Sales Division was established in 1937 in accordance with arm’s length negotiations conducted by persons having antagonistic interests. The manner of operation .and price structure under that arrangement were plainly not of such character as to divert income from either of the petitioners to Killashun. This was Certainly true during the period 1937-1939, when petitioners and Killashun were not subject to common control. And when common control was achieved in 1939 the same situation persisted until at least 1942, for there was no change of any consequence in the manner of operation or price structure. Certainly, therefore, there could be no valid basis for an allocation of income to petitioners under section 45 prior to 1942, and the Commissioner has not in fact attempted to make any such allocation. Yet, the very theory upon which he proceeded would have supported an allocation after 1939. Plainly, the mere existence of common control would not justify resort to section 45, if the same manner of operation and price structure continued in effect after the attainment of common control as existed prior thereto. However, in 1942 that common control was exercised in such manner as to shift income from petitioners to Killashun, and, but for certain wartime price regulations on which petitioners rely, we would be constrained to regard action under section 45 as warranted. With the coming of the war, and the consequent critical shortage of rubber, there appeared to be a likelihood that petitioners’ products could be sold at a substantial increase in prices. In these circumstances, Killa-shun halted all sales in December 1941. It resumed sales in January 1942, and at the same time imposed a one-dollar per gross across-the-board increase on all products sold by it. There was no change in the items sold, or in the services or functions performed by Killashun; conditions simply made it possible to get a higher price from the trade for the same products. In the case of unpackáged goods, the increase was considerably in excess of one hundred per cent. However, although Killashun raised the price to its customers, Shunk and Killian kept their prices to Killashun completely unchanged. On the very products on which Killashun was realizing increased income of one dollar per gross, Shunk and Killian deliberately refrained from increasing their own profits at all through an increase in the prices charged to Killashun. We cannot believe that business organizations free of control by common interests would have acted in this way. If there had been no ties of common control or ownership between petitioners and Killa-shun, it would have been reasonable to expect petitioners to take advantage of market conditions and to raise their prices as was done by Killashun. Their failure to do so can be viewed only as a consequence of the common ownership and control which dominated all three entities, and plainly shifted income of petitioners to Killashun. This sort of distortion in income, springing from arrangement or manipulation made possible by common control or ownership, was exactly the kind of vice at which section 45 was aimed. Cf. Treasury Regulations 111, sec. 29.45-1; Advance Machinery Exchange, Inc., 196 F. 2d 1006 (C. A. 2, 1952); Asiatic Petroleum Co. v. Commissioner, 79 F. 2d 234 (C. A. 2, 1935), certiorari denied 296 U. S. 645; National Securities Corporation v. Commissioner, 137 F. 2d 600 (C. A. 3,1943); certiorari denied 320 U. S. 794. Petitioners contend that a good business reason was responsible for their failure to increase their prices in January 1942. They assert that earlier, in 1938, they had raised their prices to the partnership, and that the higher prices encouraged new competition in the field, causing petitioners to lose business and profits. To avoid a recurrence of this situation, petitioners claim they withheld raising their prices in 1942. It is difficult, however, to assign any weight to this explanation. Gusman, an officer of petitioners and one of the persons who controlled the operations of the two corporations and the partnership, testified that the trade at large did not know what price arrangements existed between petitioners and Killashun. If the trade was uninformed as to whether a price increase by Killashun originated with it or whether Killashun was only passing on in whole or in part an increase instituted by petitioners, the actual fact in this connection could not have been a factor affecting competition in the industry. The prices in effect between petitioners and Killashun would appear, so far as the matter of outside competition was concerned, to have been unimportant in comparison with the prices charged by Eallashun and which were ultimately obtainable for the products; the latter would appear to have been the significant prices in determining the level of profit at which competing manufacturers could operate. If the hazard to which petitioners refer really existed in January 1942, it is not apparent how, on increasing Killashun’s prices, it could have been avoided merely by keeping petitioners’ prices stationary. We would therefore regard this diversion of income as an appropriate occasion for applying section 45, were it not for certain wartime price regulations issued by the Office of Price Administration. These regulations fixed maximum prices, and created a rather extraordinary situation in which an increase in price appears to have been permitted by Killashun but prohibited by petitioners. Consequently, petitioners argue that they could not have raised their prices to Killashun even if they had desired to do so. The General Maximum Price Regulation issued April 28, 1942, and effective May 11,1942 (7 Fed. Reg. 3153), fixed maximum prices of petitioners and Killashun at the highest prices charged by them in March 1942. Since Killashun had already increased its prices, petitioners contend that it was permitted to continue to charge the higher prices. Petitioners, not having done likewise, assert that they were confined to their pre-1942 prices. Thereafter two new regulations were issued on January 16,1943, effective February 1,1943, which, to the extent they applied, displaced the General Maximum Price Regulation. One, Maximum Price Regulation 300 (8 Fed. Reg. 867) applied to manufactwers of “rubber drug sundries,” within which prophylactics were included by explicit definition. The second, Maximum Price Regulation 301 (8 Fed. Reg. 873), applied to wholesalers of “rubber drug sundries.” The general effect of both these regulations was to roll maximum prices back to those charged on December 1,1941. However, by an amendment (8 Fed. Reg. 9212, 9215), effective July 9, 1943, prophylactics were expressly excluded from the scope of Maximum Price Regulation 301. As a result, maximum prices of manufacturers of prophylactics remained rolled back to December 1, 1941, but the prices of wholesalers of such articles were subject to no such restriction. Petitioners therefore contend that, even if they had increased their prices to Killashun at the beginning of 1942, they would have been compelled by the price regulation applicable to manufacturers to surrender the increase and to roll their prices back to their pre-1942 level, whereas the price regulation applicable to wholesalers, since it did not apply to prophylactics, left Killashun free to keep its 1942 price increase in effect. Petitioners argue that it is improper, under section 45, to allocate income to them based on prices higher than they were permitted to charge under the price regulations, which they assert to be their pre-1942 prices, and that section 45 does not authorize an allocation of income to them which under other laws they were prohibited from earning. The effect of the regulations, as contended by petitioners and as outlined above, has not been challenged by respondent, and he offers no other interpretation of the regulations or their significance. Assuming this understanding of the regulations, he makes two points in answer. First, he argues that petitioners cannot take advantage of the price regulations because they made no application to the Office of Price Administration for permission to increase their prices. The record is barren of any showing, however, that petitioners had grounds on which to file such an application or that they were in any way qualified for such relief. Respondent has done nothing to establish the basis on which such an application might have been filed or the conditions required for its successful prosecution. Resort to section 45 cannot be justified on unfounded speculation, and in these circumstances we are not going to conjecture as to what price relief, if any, would have been given to petitioners by the O. P. A., if they had applied therefor. Secondly, respondent asserts, without citation of authority, that sales to the Federal Government were not subject to the price ceilings. However, it was not petitioners, but Killashun which sold to the Government, and any exemption from price controls, to be of aid to respondent, would have to extend to indirect suppliers such as petitioners. Moreover, neither as to such indirect suppliers nor as to the immediate vendor has respondent demonstrated the truth of his underlying premise that sales to the Government were not subject to maximum prices imposed by the foregoing regulations. Again he has referred us to no authority, and his bald assertion becomes particularly unconvincing in the presence of indications that at least a substantial number of sales to the Government were controlled by the price ceilings. Cf. 10 C. F. R. § 81.1130 et seq. (1944 Supp.). And finally, not all of the sales of petitioners’ products were made to the Government: in 1942, petitioners’ products were sold mainly to non-Government purchasers, and in 1943 and 1945 substantial sales were made to such purchasers. We recognize that the price structure of petitioners and Killashun from December 1941 through March 1942 was not shaped in reliance on the price regulations which followed. The regulations, so far as those prices of petitioners and Killashun were concerned, were purely a subsequent fortuitous development. The regulations merely froze a condition theretofore deliberately created without reference to them by the interests in control of the three entities. There is no basis in the record for believing that petitioners would have raised their prices to Killashun in the absence of these regulations, and we can only infer that the respective prices of the controlled entities, in relation to each other, would not have been any different even if the price regulations had never come into being. To say, therefore, that because of the price regulations an improper shift of income is to be insulated from the corrective provisions of the statute, is to permit petitioners to enjoy an unexpected piece of good fortune in reduction of their taxes. But we can see no logical basis on which petitioners can be denied this windfall, in view of the uncontroverted effect of those regulations in prohibiting petitioners from receiving the very income sought to be attributed to them. We think that the Commissioner had no authority to attribute to petitioners income which they could not have received. We therefore conclude that, in allocating Killashun’s income to petitioners, respondent acted in excess of his power. A second, minor issue pertains to the rate of amortization of certain improvements made by Shunk on leased property. In 1937 it leased the premises at which its office and plant were located. The lessor apparently had no affiliations with Shunk. The lease ran for 7 years, and was renewable at Shunk’s option for a further term of 7 years. Beginning in 1937, Shunk improved the property, and, for tax purposes, as to the years 1942 through 1945 amortized the cost of the improvements over the life of the lease, including therein the 7-year renewal period. Respondent contends that amortization should have been made over the life of the improvements, relying on the facts that Charles E. Jenkins purchased the premises in 1939 and that Jenkins was then president of Shunk and one of the persons controlling the operations of petitioners and Killashun. Respondent’s position apparently rests on the conclusion that in reality Jenkins bought the property for Shunk, which thereafter occupied the premises as owner and not as lessee; or that after the purchase by Jenkins, Shunk became a lessee for an indefinite term. The evidence is contrary to both of these inferences, and we rule against respondent on this issue. Decisions will be entered under Rule 50. SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or businesses,