# COMMISSIONER OF INTERNAL REVENUE v. FIRST SECURITY BANK OF UTAH, N. A., ET AL.

No. 70–305. Argued January 10, 1972—Decided March 21, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, STEWART, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, post, p. 407. BLACKMUN, J., filed a dissenting opinion, in which WHITE, J., joined, post, p. 418.

*Ernest J. Brown* argued the cause for petitioner. On the brief were *Solicitor General Griswold, Acting Assistant Attorney General Ugast, Matthew J. Zinn,* and *Bennet N. Hollander.*

*Stephen H. Anderson* argued the cause for respondents. With him on the brief was *S. J. Quinney.*

*Ernest Getz* filed a brief for Bud Kouts Chevrolet Co. et al. as *amici curiae* urging affirmance.

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents for review a determination by the Commissioner of Internal Revenue (Commissioner), pursuant to § 482 of the Internal Revenue Act,[1] that the income of taxpayers within a controlled group should be reallocated to reflect the true taxable income of each. Deficiencies were assessed against respondents. The Tax Court affirmed the Commissioner's action, and respondents appealed to the Court of Appeals for the Tenth Circuit. That court reversed the decision of the Tax Court, 436 F. 2d 1192 (1971), and we granted the Commissioner's petition for certiorari to resolve a conflict between the decision below and that in *Local Finance Corp.* v. *Commissioner,* 407 F. 2d 629 (CA7), cert. denied, 396 U. S. 956 (1969). We now affirm the decision of the Court of Appeals.

---

[1] Title 26 U. S. C. § 482 provides:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

Respondents, First Security Bank of Utah, N. A., and First Security Bank of Idaho, N. A. (the Banks), are national banks that, during the tax years, were wholly owned subsidiaries of First Security Corp. (Holding Company). Other, non-bank, subsidiaries of the Holding Company, relevant to this case, were First Security Co. (Management Company), Ed. D. Smith & Sons, an insurance agency (Smith), and—from June 1954—First Security Life Insurance Company of Texas (Security Life). Beginning in 1948, the Banks offered to arrange for borrowers credit life, health, and accident insurance (credit life insurance). The Tax Court found that they did this "for several reasons," including (1) offering a service increasingly supplied by competing financial institutions, (2) obtaining the benefit of the additional collateral that credit insurance provides by repaying loans upon the death, injury, or illness of the borrower, and (3) providing an "additional source of income—part of the premiums from the insurance—to Holding Company or its subsidiaries."

Until 1954, any borrower who elected to purchase this insurance was referred by the Banks to two independent insurance companies. The premium rate charged was $1 per $100 of coverage per year, the rate commonly charged in the industry. The Insurance Commissioners of the States involved—Utah, Idaho, and Texas—accepted this rate. The Banks followed a routine procedure in making this insurance available to customers. The lending officer would explain the function and availability of credit insurance. If the customer desired the coverage, the necessary form was completed, a certificate of insurance was delivered, and the premium was collected or added to the customer's loan. The Banks then forwarded the completed forms and premiums to Management Company, which maintained records of the

insurance purchased and forwarded the premiums to the insurance carrier. Management Company also processed claims filed under the policies. The cost to each of the Banks for the actual time devoted to explaining and processing the insurance was less than $2,000 per year, characterized by the courts below as "negligible." The cost to Management Company of the services rendered by it was also negligible, slightly in excess of $2,000 per year.

It was the custom in the insurance business (although not invariably followed), regardless of the cost of incidental paperwork, to pay a "sales commission"—ranging from 40% to 55% of net premiums collected—to a party who originated or generated the business. But the Banks had been advised by counsel that they could not lawfully conduct the business of an insurance agency or receive income resulting from their customers' purchase of credit life insurance. Neither the Banks nor any of their officers were licensed to sell insurance, and there is no question here of unlawfully acting as unlicensed agents. The Banks received no commissions or other income on or with respect to the credit insurance generated by them. During the period from 1948 to 1954 commissions were paid by the independent companies writing the insurance directly, to Smith, one of the wholly owned subsidiaries of Holding Company. These commissions were reported as taxable income, not by Smith, but by Management Company which had rendered the services above described. During this period (1948–1954), the Commissioner did not attempt to allocate the commissions to the Banks.[2]

---

[2] The corporate income tax imposes the same rate of taxation on taxable income up to $25,000 and the same rate for income greater than $25,000. 26 U. S. C. § 11. Therefore, if, excluding the sales commissions in question, we assume, as seems likely, that before

In 1954, Holding Company organized Security Life, a new wholly owned subsidiary licensed to engage in the insurance business. A new procedure was then adopted with respect to placing credit life insurance. It was referred by the Banks to, and written by an independent company, American National Insurance Company of Galveston, Texas (American National), at the same rate to the customer. American National then reinsured the policies with Security Life pursuant to a "treaty of reinsurance." For assuming the risk under the policies sold to the Banks' customers, Security Life retained 85% of the premiums. American National, which furnished actuarial and accounting services, received the remaining 15%. No sales commissions were paid. Under this new plan,[3] the Banks continued to offer credit life insurance to their borrowers in the same manner as before.[4]

Security Life was not a paper corporation. It commenced business in 1954 with an initial capital of $25,000,

1954 the income of both respondents and of Management Company exceeded $25,000, then the total taxes paid by the Holding Company subsidiaries would not be affected if the commissions were allocated wholly to respondents, or to Management Company, or partially to all three.

[3] This plan was proposed to Holding Company by American National, which was making similar recommendations to other financial institutions. The Tax Court found that insurance companies anticipated that lending institutions would soon begin to form their own affiliated life insurance companies to write the credit insurance, which was proving to be a profitable business. Such a move by lending institutions would deprive the independent insurance companies of substantial credit insurance business. The type of plan recommended by American National was intended to salvage a portion of such business by charging a fee for the actuarial, accounting, and other services made available to Security Life, which reinsured the entire risk. T. C. Memo 1967–256.

[4] Taxpayers are, of course, generally free to structure their business affairs as they consider to be in their best interests, including lawful structuring (which may include holding companies) to minimize taxes. Perhaps the classic statement of this principle is Judge

which was increased in 1956 to $100,000. Although it did not become a full-line insurance company (contemplated as a possibility when organized), its reinsurance business was substantial. The risks assumed by it had grown to $41,350,000 by the end of 1959, and it had paid substantial claims.[5]

Security Life reported the entire amount of reinsurance premiums, 85% of the premiums charged, in its income for the years 1955–1959. Because the income of life insurance companies then was subject to a lower effective tax rate than that of ordinary corporations, the total tax liability for Holding Company and its subsidiaries was less than it would have been had Security Life paid a part of the premium to the Banks or Management Company as sales commissions.[6] Pursuant to his § 482

---

Learned Hand's comment in his dissenting opinion in *Commissioner* v. *Newman,* 159 F. 2d 848, 850–851 (CA2 1947):

"Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant."

See *Knetsch* v. *United States,* 364 U. S. 361, 365 (1960); Chirelstein, Learned Hand's Contribution to the Law of Tax Avoidance, 77 Yale L. J. 440 (1968).

[5] The opinion of the Tax Court, *supra,* includes tables showing the profitability of Security Life. Its net worth (capital and surplus) increased from $161,370.52 at the end of 1955 to $1,050,220 at the end of 1959, despite the paying out of claims and claims expenses over the five-year period totaling $525,787.91. The Tax Court found that: "Although Security Life's business proved to be successful, there was no way to judge at the outset whether it would succeed. In relation to its capital structure, Security Life reinsured a large amount of risk."

[6] Both the Life Insurance Company Tax Act for 1955, 70 Stat. 36, applicable to the years 1955–1957, and the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112, applicable to later years, accorded preferential tax treatment to life insurance companies.

power to allocate gross income among controlled corporations in order to reflect the actual incomes of the corporations, the Commissioner determined that 40% of Security Life's premium income was allocable to the Banks as compensation for originating and processing the credit life insurance.[7]   It is the Commissioner's view that the 40% of the premium income so allocated is the equivalent of commissions that the Banks earned and must be included in their "true taxable income." [8]

The parties agree that § 482 is designed to prevent "artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises." [9] Treasury Regulations provide:

> "The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. . . . The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." [10]

The question we must answer is whether there was a shifting or distorting of the Banks' true net income

---

[7] The Commissioner made an alternative allocation to Management Company.   Because it upheld his allocation to the Banks, the Tax Court rejected this alternative.   In reversing the allocation to the Banks, the Court of Appeals found the record insufficient to pass on the alternative allocation.   It therefore ordered that the case be remanded to the Tax Court for further consideration.   The alternative allocation is therefore not before us.

[8] See 26 CFR § 1.482–1 (a) (6) (1971).

[9] B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders p. 15–21 (3d ed. 1971).

[10] 26 CFR § 1.482–1 (b) (1) (1971).   The first regulations interpreting this section of the statute were issued in 1934.   They have remained virtually unchanged.   Jenks, Treasury Regulations Under Section 482, 23 Tax Lawyer 279 (1970).

resulting from the receipt and retention by Security Life of the premiums above described.[11]

We note at the outset that the Banks could never have received a share of these premiums. National banks are authorized to act as insurance agents when located in places having a population not exceeding 5,000 inhabitants, 12 U. S. C. A. § 92.[12] Although § 92 does not explicitly prohibit banks in places with a population of over 5,000 from acting as insurance agents, courts have held that it does so by implication.[13] The Comptroller

---

[11] The court below held that the mere generation of business does not necessarily result in taxable income. As we decide this case on a different ground, we need not consider the circumstances in which the origination or referral of business may or may not result in taxable income to the originating party. We do agree that origination of business does not necessarily result in such income. In this case if the Banks had been unaffiliated with any other entities (i. e., had been separate, independent banks, unaffiliated with any holding company group), they would nevertheless have performed the "services" that the Commissioner asserts resulted in taxable income. These services—namely the negligible paperwork and the referring of the credit insurance to a company licensed to write it—were performed (as the Tax Court noted) for the convenience of bank customers and to assure additional collateral for loans. They also may have been necessary to meet competition. The fact of affiliation, enabling referral of the business to another subsidiary in the holding company group, does not alter the character of what was done. The act which is relevant, in terms of generating insurance premiums and commissions, is the *referral* of the business. Whether this referral is to an affiliated or an unaffiliated insurance company should make no difference as to whether the bank, which never receives the income, has earned it.

[12] Section 92 of the National Bank Act was enacted in 1916. When the statutes were revised in 1918 and re-enacted, § 92 was omitted. The revisers of the United States Code have omitted it from recent editions of the Code. However, the Comptroller of the Currency considers § 92 to be effective and he still incorporates the provision in his Regulations, 12 CFR §§ 2.1–2.5 (1971).

[13] *Saxon* v. *Georgia Association of Independent Insurance Agents, Inc.*, 399 F. 2d 1010 (CA5 1968). See *Commissioner* v. *Morris Trust*, 367 F. 2d 794, 795 (CA4 1966).

of the Currency has acquiesced in this holding,[14] and the Court of Appeals for the Tenth Circuit expressed its agreement in the opinion below.

The penalties for violation of the banking laws include possible forfeiture of a bank's franchise and personal liability of directors. The Tax Court found that the Banks, upon advice of counsel, "held the belief that it would be contrary to Federal banking law . . . to receive income resulting from their customers' purchase of credit insurance" and, pursuant to this belief, "the two Banks have never received or attempted to receive commissions or reinsurance premiums resulting from their customers' purchase of credit insurance." [15]

Petitioner does not contest this finding by the Tax Court or the holding in this respect of the Court of Appeals below. Accordingly, we assume for purposes of this decision that the Banks were prohibited from receiving insurance-related income, although this prohibition did not apply to non-bank subsidiaries of Holding Company.[16]

---

[14] 12 CFR §§ 2.1–2.5 (1971).

[15] Findings of fact and opinion in T. C. Memo 1967–256, p. 67–1456, filed Dec. 27, 1967, in this case.

[16] Mr. Justice Marshall's dissenting opinion is based on the "crucial fact . . . [that] respondents [the Banks] have already violated the federal statute and regulations by soliciting insurance premiums." The statute, 12 U. S. C. A. § 92, prohibits a national bank from acting "as the agent" of an insurance company "by soliciting and selling insurance and collecting premiums on policies." Mr. Justice Marshall concludes that the banks have violated this statute, and notes that "the penalties . . . are indeed severe."

This finding of illegality, with respect to conduct of the Banks extending back to 1948, is without support either in the record or in any authority cited. Indeed, the record is to the contrary. The Tax Court found as a fact that there was no "agency agreement" between the Banks and the insurance companies; it further found that the Banks "*made available*" the credit insurance to their customers. There is no finding, and nothing in the record to support

We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving. In cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it. The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it. "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." *Corliss* v. *Bowers*, 281 U. S. 376, 378 (1930).

It is, of course, well established that income assigned before it is received is nonetheless taxable to the assignor. But the assignment-of-income doctrine assumes

---

a finding, that the Banks were agents of the insurance companies or that they engaged in "selling insurance" within the meaning of the statute. The Banks no doubt "solicited" in the sense that they encouraged their customers to take out the insurance. But in the absence of an agency relationship, and in view of the undisputed fact that the Banks received no commissions or premiums, it cannot be said that there was a violation of the statute. Moreover, the Banks were regularly examined by the federal banking authorities "looking for violations in the national banking laws." The making of credit insurance available to customers was and is a common practice in the banking business. There is no suggestion that the federal banking authorities considered this service to customers to be a violation of the law as long as the Banks received no commissions or fees. This administrative interpretation over many years is entitled to great weight.

The dissenting opinion raises this serious issue for the first time. It was not raised at any stage in the proceedings below. Nor was it briefed or argued in this Court. The Commissioner, the Tax Court, the Court of Appeals, and the Solicitor General all assumed that the Banks' conduct in this respect was perfectly lawful. But quite apart from the consistent administrative acceptance and from the assumptions by the Commissioner and the courts below, we think there is no basis for a finding of this serious statutory violation.

that the income would have been received by the taxpayer had he not arranged for it to be paid to another. In *Harrison v. Schaffner,* 312 U. S. 579, 582 (1941), we said:

> "[O]ne vested with the right to receive income [does] not escape the tax by any kind of anticipatory arrangement, however skillfully devised, by which he procures payment of it to another, since, by the exercise of his power to command the income, he enjoys the benefit of the income on which the tax is laid." [17]

One of the Commissioner's regulations for the implementation of § 482 expressly recognizes the concept that income implies dominion or control of the taxpayer. It provides as follows:

> "The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers." [18]

This regulation is consistent with the control concept heretofore approved by this Court, although in a different context. The regulation, as applied to the facts in this case, contemplates that Holding Company—the controlling interest—must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the "true taxable income" of a subsidiary has been

---

[17] See *Helvering* v. *Horst,* 311 U. S. 112 (1940) (assignment of interest coupons attached to bonds owned by taxpayer); *Lucas* v. *Earl,* 281 U. S. 111 (1930) (taxpayer assigned to wife one-half interest in his earnings). See generally *Commissioner* v. *Sunnen,* 333 U. S. 591 (1948), and cases discussed therein at 604–610.

[18] 26 CFR § 1.482–1 (b) (1) (1971).

understated, that the Commissioner is authorized to reallocate under § 482. But Holding Company had no such power unless it acted in violation of federal banking laws. The "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law.

Apart from the inequity of attributing to the Banks taxable income that they have not received and may not lawfully receive, neither the statute nor our prior decisions require such a result. We are not faced with a situation such as existed in those cases, urged by the Commissioner, in which we held the proceeds of criminal activities to be taxable.[19] Those cases concerned situations in which the taxpayer had actually received funds. Moreover, the illegality involved was the act that gave rise to the income. Here the originating and referring of the insurance, a practice widely followed, is acknowledged to be legal. Only the receipt of insurance commissions or premiums thereon by national banks is not. Had the Banks ignored the banking laws, thereby risking the loss of their charters and subjecting their officers to personal liability,[20] the illegal-income cases would be relevant. But the Banks from the inception of their use of credit life insurance in 1948 were careful never to place themselves in that position. We think that fairness requires the tax to fall on the party that actually receives the premiums rather than on the party that cannot.[21]

---

[19] *James* v. *United States,* 366 U. S. 213 (1961); *Rutkin* v. *United States,* 343 U. S. 130 (1952).

[20] 12 U. S. C. § 93.

[21] Thus, in *Commissioner* v. *Lester,* 366 U. S. 299 (1961), in determining that a taxpayer should not be taxed on alimony payments to his divorced wife, the Court determined that it was more consistent with the basic precepts of income tax law that the wife, who received and had power to spend the payments, should be taxed rather than the husband who actually earned the money.

In *L. E. Shunk Latex Products, Inc.* v. *Commissioner,*
18 T. C. 940 (1952), the Tax Court considered a closely
analogous situation. The same interest controlled a
manufacturer and a distributor of rubber prophylactics.
The OPA Price Regulations of World War II became
effective on December 1, 1941. Prior thereto the dis-
tributor had raised its prices to retailers, but the manu-
facturer had not increased the prices charged to its
affiliated distributor. The Commissioner, acting under
§ 482, attempted to allocate some of the distributor's in-
come to the manufacturer on the ground that a portion
of the distributor's profits was in fact earned by the
manufacturer, even though the manufacturer was pro-
hibited by the OPA regulations from increasing its
prices. In holding that the Commissioner had acted
improperly, the Tax Court said that he had "no au-
thority to attribute to petitioners income which they
could not have received." 18 T. C., at 961.[22]

It is argued, finally, that the "services" rendered by
the Banks in making credit insurance available to cus-
tomers "would have been compensated had the corpora-

---

[22] As noted at the outset of this opinion, certiorari was granted
to resolve the conflict between the decision below and that in *Local
Finance Corp.* v. *Commissioner,* 407 F. 2d 629 (CA7 1969). The Tax
Court in this case felt bound to follow *Local Finance Corp.,* which
was decided subsequently to *L. E. Shunk Latex Products, Inc.* v.
*Commissioner,* 18 T. C. 940 (1952). For the reasons stated in the
opinion above, we think *Local Finance Corp.* was erroneously decided
and that the earlier views of the Tax Court were correct.

See *Teschner* v. *Commissioner,* 38 T. C. 1003, 1009 (1962):

"In the case before us, the taxpayer, while he had no power to
*dispose* of income, had a power to appoint or designate its recipient.
Does the existence or exercise of such a power alone give rise to
taxable income in his hands? We think clearly not. In *Nicholas A.
Stavroudis,* 27 T. C. 583, 590 (1956), we found it to be settled
doctrine that a power to direct the distribution of trust income to
others is not alone sufficient to justify the taxation of that income
to the possessor of such a power."

tions been dealing with each other at arm's length." [23] The short answer is that the proscription against acting as insurance agent and receiving compensation therefor applies to *all* national banks located in places with population in excess of 5,000 inhabitants. It applies equally to such banks whether or not they are controlled by a holding company. If these Banks had been independent of any such control—as most banks are—no commissions or premiums could have been received lawfully and there would have been no taxable income.[24] As stated in the Treasury Regulations, the "purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer . . . ." [25] We think our holding comports with such parity treatment.

We conclude that the premium income received by Security Life could not be attributable to the Banks. Holding Company did not utilize its control over the Banks and Security Life to distort their true net incomes. The Commissioner's exercise of his § 482 authority was therefore unwarranted in this case. The judgment below is

*Affirmed.*

MR. JUSTICE MARSHALL, dissenting.

The facts of this case illustrate the natural affinity that lending institutions and insurance companies have for each other. Congress depends on the ability of the Commissioner of Internal Revenue to utilize § 482 of the Internal Revenue Code, 26 U. S. C. § 482, to insure that this affinity does not provide a basis for tax avoidance. H. R. Rep. No. 1098, 84th Cong., 1st Sess., 7; S. Rep. No. 1571, 84th Cong., 2d Sess., 8. In my opin-

---

[23] See dissenting opinion of MR. JUSTICE BLACKMUN, *post,* at 422.

[24] If an unaffiliated bank were able to provide the insurance at a cheaper rate because no commissions were paid, this would benefit the customers but would result in no taxable income.

[25] 26 CFR § 1.482–1 (b) (1) (1971).

ion, today's decision renders § 482 a less efficacious weapon against tax avoidance schemes than Congress intended and provides the respondents with an unwarranted tax advantage. I dissent.

Section 482 provides:

> "In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

First enacted as § 45 of the Revenue Act of 1928, 45 Stat. 806, the statute was intended to prevent the avoidance of tax liability through fictions and "to deny the power to shift income . . . arbitrarily among controlled corporations, and to place such corporations rather on a parity with uncontrolled concerns." *Central Cuba Sugar Co.* v. *Commissioner,* 198 F. 2d 214, 216 (CA2 1952). See H. R. Rep. No. 2, 70th Cong., 1st Sess., 16–17; S. Rep. No. 960, 70th Cong., 1st Sess., 24–25. It is intended to serve the same purpose in the present Code.

It is well-established law that in analyzing a transaction under § 482, the test is whether the arrangement as structured for income tax purposes by interlocking corporate interests would have been similarly structured by taxpayers dealing at arm's length. See, *e. g., Borge* v. *Commissioner,* 405 F. 2d 673 (CA2 1968), cert. denied *sub nom. Danica Enterprises* v. *Commissioner,* 395 U. S.

933 (1969); *Eli Lilly & Co.* v. *United States,* 178 Ct. Cl. 666, 372 F. 2d 990 (1967).

Applying that test to this case, the following facts are relevant. Before 1954, an independent insurance company paid respondents commissions ranging from 40% to 45% for their services in offering insurance to borrowers designed to discharge their debts in the event that they died or became disabled during the term of their loans. After 1954, respondents offered borrowers policies issued by a different insurance company. At this time the holding company that controlled respondents created a new subsidiary to reinsure the borrowers who purchased policies. By paying off the independent insurance company with 15% of the proceeds of the policies, the subsidiary assumed the insurance risks and garnered the remaining 85% of the proceeds. No commission was paid to respondents by either the independent company or the insurance subsidiary.

The tax advantage of the post-1954 structure derived from the fact that the Life Insurance Company Tax Act for 1955, 70 Stat. 36, as amended by the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112, as amended, 26 U. S. C. § 801 *et seq.,* gives preferential tax treatment to life insurance companies. By funneling all proceeds from the sales of the insurance policies to a subsidiary that qualified for tax treatment as a life insurance company, the holding company avoided the heavier tax that would have been imposed on respondents had they been paid commissions.

The Commissioner's analysis of this case is not overly complex: He saw that respondents performed essentially the same services and generated the same income after 1954 that they did before, and he concluded that § 482 required that they should be taxed on the premiums that they were actually earning.

Based on respondents' earlier experience dealing *at arm's length* with an independent insurance company and on the well-known fact that insurers pay solicitors a portion of the premium as a commission for generating income, see *Local Finance Corp.* v. *Commissioner,* 48 T. C. 773, 786 (1967), aff'd, 407 F. 2d 629, 631–632 (CA7 1969), the Commissioner determined that 40% of the premium income was properly allocated to respondents.

The respondents make, in essence, two arguments in their attempt to rebut the Commissioner's position. First, they urge that they never received any funds as a result of offering the policies to borrowers, and that it is therefore unfair to tax them on any portion of said proceeds. If § 482 is to have any meaning, that argument must be rejected. It makes absolutely no sense to examine this case with a technical eye as to whether respondents actually received or had a "right" to receive any commissions. This is not a case involving independent companies or private individuals where we must scrupulously avoid taxing someone on money he will never receive regardless of his will in the matter. See, *e. g., Blair* v. *Commissioner,* 300 U. S. 5 (1937); cf. *Teschner* v. *Commissioner,* 38 T. C. 1003 (1962). This is a case involving related corporations, and § 482 recognizes that such corporations may be treated differently from natural persons or unrelated corporations for certain tax purposes.

We need not look far to find that this entire complicated economic structure—established, designed, administered, and amendable by the holding company—had the right to the proceeds. Pursuant to § 482, the Commissioner properly attempted to insure that the proceeds would be equitably allocated.

The Court apparently concedes that if respondents' only argument against taxation were that they have

received no money, that argument would fail. This concession is, in fact, mandated by various decisions of this Court, including *Harrison* v. *Schaffner,* 312 U. S. 579 (1941); *Helvering* v. *Horst,* 311 U. S. 112 (1940), and *Lucas* v. *Earl,* 281 U. S. 111 (1930).

Having implicitly rejected the argument that mere nonreceipt of money is sufficient to avoid taxation, the Court proceeds to accept respondents' second argument that in this case the taxpayer is legally barred from ever receiving money, and in this circumstance he cannot be taxed on it. Respondents find a legal bar to receipt of the proceeds at issue here in 12 U. S. C. A. § 92, which provides:

> "In addition to the powers now vested by law in national banking associations organized under the laws of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which such bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company; and may receive for services so rendered such fees or commissions as may be agreed upon between the said association and the insurance company for which it may act as agent; and may also act as the broker or agent for others in making or procuring loans on real estate located within one hundred miles of the place in which said bank may be located, receiving for such services a reasonable fee or commission: *Provided, however,* That no such bank shall in any case guarantee

either the principal or interest of any such loans or assume or guarantee the payment of any premium on insurance policies issued through its agency by its principal: *And provided further,* That the bank shall not guarantee the truth of any statement made by an assured in filing his application for insurance."

This statute by inference and the regulations of the Comptroller of the Currency, 12 CFR §§ 2.1–2.5, by explicit language bar national banks in communities with more than 5,000 inhabitants from selling, soliciting, or receiving the proceeds from selling insurance. Respondents are within the legal prohibition and the penalties provided for a violation are indeed severe. Assuming that the respondents will not attempt to violate the law and not wishing to appear to encourage a violation, the Court concludes that respondents will receive none of the proceeds and that they cannot be taxed on money they will never receive.

But the crucial fact in this case is that under their own theory respondents have already violated the federal statute and regulations by soliciting insurance premiums. Title 12 U. S. C. A. § 92 was added to the federal banking laws in 1916 at the suggestion of John Skelton Williams, who was then Comptroller of the Currency. He wrote to Congress to recommend that national banks in small communities be permitted to associate with insurance companies, but that banks in larger communities be prohibited from doing the same:

"It seems desirable from the standpoint of public policy and banking efficiency that this authority should be limited to banks in small communities. This additional income will strengthen them and increase their ability to make a fair return to their shareholders, while the new business is not likely to

assume such proportions as to distract the officers of the bank from the principal business of banking. Furthermore in many small places the amount of insurance policies written . . . is not sufficient to take up the entire time of an insurance broker, and the bank is not therefore likely to trespass upon outside business naturally belonging to others.

"I think it would be unwise and therefore undesirable to confer this privilege generally upon banks in large cities where the legitimate business of banking affords ample scope for the energies of trained and expert bankers. I think it would be unfortunate if any movement should be made in the direction of placing the banks of the country in the category of department stores. . . ." Letter of June 8, 1916, to Senate, 53 Cong. Rec. 11001.

There is nothing in the history of the provision to indicate that Congress was more concerned with banks' actually receiving money than with their performing the activities that generated the money. In fact, the history that is available indicates that it is the activities themselves that Congress wished to stop. Banks in large communities were simply not permitted to do anything that insurance agents might do, *i. e.,* they were not permitted to solicit insurance.

Under respondents' theory of the case, the legal violation is thus a *fait accompli* and the respondents are taxable as if there had been no illegality.[1] See, *e. g., United*

---

[1] Neither the statute nor the regulations use the words "originating and referring" insurance. These are the words chosen by the Court to describe the respondents' activities, *ante,* at 405. The statute and regulations speak of "soliciting and selling." Because the respondents themselves argue that they would violate § 92 and the regulations were they to receive the income generated by their activities, I assume that they, in effect, are admitting that these activities amounted to "soliciting and selling" insurance. Thus,

*States* v. *Sullivan,* 274 U. S. 259 (1927); *Rutkin* v. *United States,* 343 U. S. 130 (1952); *James* v. *United States,* 366 U. S. 213 (1961). See also *Tank Truck Rentals* v. *Commissioner,* 356 U. S. 30 (1958).

the Commissioner could properly determine that the statute was violated by the acts of solicitation, and, as the Court recognizes, since "the illegality involved was the act which gave rise to the income," this Court's prior decisions permit the Commissioner to tax the income of the lawbreakers.

If, however, the Court is attempting to distinguish *sub silentio* between "originating and referring" and "soliciting" and is concluding that only the latter is illegal, then there is nothing in the statute or regulations that would make illegal the receipt of income generated by the former. Hence, the Commissioner could reject the respondents' second argument that it would violate federal banking laws to include the proceeds in their income.

Whichever approach the Court selects, the statute requires consistency—*i. e.,* the statute requires that the activities that produce income be illegal before the receipt of the income is deemed to violate the law.

I agree with the Court that deference must be paid to the expertise of the Comptroller, but in proposing that § 92 be added to the already existing banking laws, Comptroller Williams himself noted that "[i]t is certainly clear that the Comptroller of the Currency has no right to authorize or permit a national bank to exercise powers not conferred upon it by law." Letter of June 8, 1916, *supra.*

Senator Owen, who shepherded the 1916 legislation through the Senate, noted at one point that § 92 is not a very important part of the statute. 53 Cong. Rec. 11001. Perhaps, it is therefore unimportant whether or not the respondents have technically violated it. Whether or not the Comptroller has properly permitted such activities to take place may also be of no great moment.

What is critical to a correct disposition of this case, in my view, is that if respondents' activities are not illegal, there is no reason that receipt of the income generated from them should be illegal. It should be pointed out that the theory that receipt of said income would be illegal was first proffered by respondents' counsel. This theory is certainly self-serving in the sense that it provides what the Court regards as the dispositive factor in this case without hindering the activities of the holding company in any way.

The Court suggests that the Commissioner has never relied on the

The Court seeks, however, to distinguish all of the prior cases holding that a taxpayer may be taxed on income illegally earned on the ground that the issue was never raised as to whether the taxpayers in those cases had actually received the income. The distinction is valid but it does not warrant a different result in this case.

The reasoning of the majority runs along these lines: if A violates the law—by attempted embezzlement or by illegally soliciting insurance sales, for example—but he receives no money and has no "legal right" to receive any money, then he cannot be taxed as if the money had been received; but, if A actually embezzles money or receives insurance premiums in violation of the law, A can be taxed even though he may have transferred the money without any personal gain to a third party from whom he has no right of recovery.

I would agree with this analysis in most cases. Where I differ from the Court is in which category to place this transaction. To pretend that respondents have not received any money and have no right to any money is to ignore the thrust of § 482. That section requires that we treat this case as if the commissions had been paid to

---

theory of the case expressed in this opinion. On the contrary, the Commissioner argued in his brief (p. 13) as follows:

"The Commissioner's allocation does not force respondents to violate the federal banking law. It was they, not the Commissioner, who chose to solicit and sell credit life insurance at a rate set at a sufficiently high level to permit the payment of commissions. If their activities did not violate the banking law, the Commissioner's allocation will not, of itself, constitute a violation on their part. And, surely, the payment of taxes would not be an illegal act."

Both sides dealt with this point in oral argument. Tr. of Oral Arg. 14–18, 30, 40.

This is the nub of the case. What is there in the legislative history or the purpose of § 92 that requires that we treat the activities as legal, but the receipt of the income they generate as illegal?

respondents and had been transferred to the insurance subsidiary by them. Of course, that did not occur. But, we know that the whole notion of the section is to look behind the form in which a transaction is structured to its substance. The substance is either that the respondents violated federal law, earned illegal income, attempted to avoid taxation on the income by channeling it elsewhere, and were caught by the Commissioner; or, that they did not violate federal law by soliciting sales of insurance and that there is no legal bar to their receiving the proceeds from their sales. In either case, the result is the same, and respondents cannot prevail.

If respondents had actually received the proceeds and transferred them to the insurance subsidiary, they would still be free to make essentially the same argument that they make in this case, *i. e.*, they could argue that federal law prohibited them from receiving the money; that they violated federal law, but had no right to keep the money; and that they should not be taxed on receipt of funds which they could not legally keep.

To be consistent with the assignment-of-income cases, *Helvering* v. *Horst, supra,* and *Lucas* v. *Earl, supra,* and the line of cases that includes *Rutkin* v. *United States, supra,* and *James* v. *United States, supra,* the Court would have to reject this argument. Yet, I maintain that this is just what the taxpayer is arguing here. The Commissioner has determined that in reality the respondents have earned income, and he has taxed it under § 482. To reject his position is to give undue weight to the absence of technical temporary possession of money and some abstract concept of a "right" to receive it. I had thought that this kind of technical reasoning was rejected in *James* v. *United States, supra,* when the Court overruled *Commissioner* v. *Wilcox,* 327 U. S. 404 (1946).

Finally, even if there is some mysterious reason why the banking laws should be read in the manner suggested by respondents, there is still another reason why they should not prevail. The fact would remain that they consciously chose to perform services in order that their parent holding company would reap financial rewards.[2] Certainly, there is nothing in the federal banking laws that required the performance of these services. In the context of a complex corporate structure ministered by one large holding company, the purposes of § 482 are best served by permitting the Commissioner to allocate income to the company that earns it, rather than to the company that receives it. Again, we must remember that this is not a case of unrelated private individuals or independent corporations where there might be some danger that in allocating income to the person who generated but did not receive it, the Commissioner would render that person financially unable to pay his taxes. This case involves one large interrelated system. It would be total fiction to assume that the holding company would leave its subsidiaries in a financial bind. Hence, there is no good reason to bar the Commissioner from taxing respondents on the money that they earn.[3]

In my view, the Commissioner has done exactly what § 482 requires him to do in this case. Accordingly, I

[2] While the premiums from the insurance policies were not paid directly to the parent, there can be no doubt that the parent benefited from the financial success of its subsidiaries.

[3] We know that nontax statutes do not normally determine the tax consequences of a particular transaction. There is no inherent inconsistency in reading the banking legislation as making the receipt of insurance premiums illegal, and, at the same time, reading the Internal Revenue Code as allowing the Commissioner to allocate the income from the sale of insurance policies to the party actually earning it, so long as the income is received by the corporation controlling that party.

would reverse the decision of the Court of Appeals and would remand the case with a direction that judgment be entered for the petitioner.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE WHITE joins, dissenting.

As I read the Court's opinion, I gain the impression that it chooses to link legality with taxability or, to put it better oppositely, that it ties illegality to receive with inability to tax. I find in the Internal Revenue Code no authority for the concoction of a restrictive connection of that kind. Because I think that the Commissioner's allocation of income here, under the auspices of § 482 of the 1954 Code, and in the light of the established facts, was proper, I dissent.

1. Section 482 [1] surely contemplates taxation of income without formal receipt of that income. That, indeed, is the scope and purport of the statute. It is directed at income distortion by a controlling interest among two or more of the controlled entities. I, therefore, am not convinced that the fact the income in question here did not flow through the Banks at any time—because it was deemed proscribed by the 1916 Act (if the pertinent portion thereof, 39 Stat. 753, is still in effect, a proposition which may not be free from doubt),[2] and because the

---

[1] Section 482 is not new. It appeared as § 45 of the Revenue Act of 1928, 45 Stat. 806, and has predecessors in § 240 (f) of the Revenue Act of 1926, 44 Stat. 46, and in § 240 (d) of the Revenue Act of 1924, 43 Stat. 288.

[2] The revisers of the United States Code in 1952 omitted the section because of the possibility of its having been repealed by its omission from the amendment and re-enactment in 1918 of § 5202 of the Revised Statutes by § 20 of the War Finance Corporation Act, 40 Stat. 512. Compare administrative ruling No. 7110 of the Comptroller of the Currency with the Comptroller's current regulations, 12 CFR §§ 2.1–2.5. See Saxon v. Georgia Association of Independent Insurance Agents, Inc., 399 F. 2d 1010 (CA5 1968); Com-

controlling interest routed it elsewhere—serves, in and of itself, to deny the efficacy of the statute.

2. Section 482 has a double purpose and a double target. It authorizes the Secretary or his delegate, that is, the Commissioner, to allocate whenever he determines it necessary so to do in order (a) "to prevent evasion of taxes" or (b) "clearly to reflect the income of any" of the controlled entities. The use of the statute, therefore, is not restricted to the intentional tax evasion. No evasion of tax, in the criminal sense, by these Banks is specifically suggested or at issue here. And I do not subscribe to my Brother MARSHALL's intimation that what the Banks were doing was otherwise illegal. The second alternative of the statute, however, is directed at something other than tax evasion or illegality. It is concerned with the proper reflection of income (or deductions, credits, or allowances) so as to place the controlled taxpayer on a tax parity with the uncontrolled taxpayer. It is designed to produce for tax purposes, and to recognize, economic realities and to have the tax consequences follow those realities and not some structured nonreality. This is the aspect of the statute with which the Commissioner and these respondents are here concerned. Thus, legality and illegality seem to me to be beside the point.

3. From this it follows that the Court's repetitive emphasis on the missing § 92 and the inability of these Banks legally to receive the insurance commissions give undue emphasis to the first alternative of § 482, and seem almost wholly to ignore the second.

4. The purpose of the controlling interest in structuring the several entities it controls is apparent and can-

_missioner_ v. _Morris Trust_, 367 F. 2d 794, 795 (CA4 1966); Hackley, Our Baffling Banking System, pt. 2, 52 Va. L. Rev. 771, 777–779 (1966). United States Code Annotated carries the provision as § 92 of its Title 12.

not be concealed. The Banks were wholly owned subsidiaries of Holding Company. The Tax Court found—and the respondents concede [3]—that one of the purposes of the Banks' arranging for borrowers' credit life insurance [4] was "to provide an additional source of income—part of the premiums from the insurance—to Holding Company or its subsidiaries." T. C. Memo 1967–256, p. 67–1453. For me, that means to provide an additional source of income for the group irrespective of the particular pocket into which that income might initially be routed.

5. What, then, happened? The chronology is revealing:

(a) Initially, that is, until 1954, the Banks solicited the insurance, charged the premium, and forwarded it to Management Company. The latter in turn sent it on to the then-favored independent insurance carrier. That carrier paid the recognized sales commission to Smith, Management Company's wholly owned insurance agency.[5]

(b) In 1954 the American National-Security Life arrangement appeared on the scene. This was prompted by the blossoming of the credit insurance business as a profitable undertaking. Obviously, it was a matter of concern to established and independent insurance companies when they came to realize that lending institutions were in a position to form their own insurance affiliates

---

[3] Brief for Respondents 2.

[4] I use this and other terms as they have been defined in the Court's opinion.

[5] Despite this payment to Smith, it was not Smith, but Management Company, that reported the commissions as taxable income. This reveals the fluidity of control of the structure. Of course, the fact that the Commissioner did not allocate the premiums to the Banks during this period is of small, if any, significance, for, as the Court points out, *ante*, at 397–398, n. 2, the then tax rate for each of the corporate entities was likely the same. The Government thus would lose nothing by not allocating.

to tap and drain away profits that the independents theretofore had received without hindrance. Security Life was just such an emerging insurance affiliate of Holding Company and of Management Company. But American National, by its proposal to Management Company, as well as to other financial institutions, salvaged 15% of the premium dollar in return for actuarial and accounting services. Security Life never did develop into a full-line insurance company; it remained essentially a re-insurer and yet it accomplished the purpose for which it was given life. Now no sales commissions needed to be paid. In fact, none were paid; they just disappeared, and that erstwhile cost remained as profit in Security Life. But the Banks, as before, solicited their borrowing customers to purchase credit life insurance.

(c) The Life Insurance Company Tax Act for 1955 was enacted, 70 Stat. 36, followed by the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112. These statutes served to accord preferential tax treatment—as compared to ordinary corporations—to life insurance companies. See *United States* v. *Atlas Life Ins. Co.*, 381 U. S. 233 (1965). This happily coincided, of course, with Security Life's development.

6. Only the Banks were the responsible force behind the premium income. No one else was. Certainly American National was not. Certainly Security Life was not. Smith was out of the picture. And if it can be said that Management Company or Holding Company contributed a part, they did so only secondarily. It was the participating bank that explained to the borrower the function and availability of the insurance; that gave the customer the application form; that examined the application; that prepared the certificate of insurance; that collected the premium or added it to the loan; and that sent the form and the premium to Management Company. It was the participating bank that thus

offered and sold on behalf of a life insurance company under common control with the bank. It was the participating bank, in short, that did what was necessary, and all that was necessary, to sell the insurance. Clearly, services were rendered by that bank on behalf of its commonly controlled affiliate. Just as clearly, those services would have been compensated had the corporations been dealing with each other at arm's length.

7. It is no answer to say that generation of income does not necessarily lead to taxation of the generator; here the earnings themselves stayed within the corporate structure dominated by Holding Company, and did not pass elsewhere with consequent tax impact elsewhere. I do not so easily differentiate, as does the Court, *ante,* at 401 n. 11, between referral outside the affiliated structure and referral conveniently within that structure to a re-insurance company that could be taxed on the premium income (unreduced by commissions) at advantageous tax rates.

8. That the selling effort of the Banks seems comparatively minimal and that the processing cost seems comparatively negligible are, I believe, beside the point and quite irrelevant. No one else devoted effort or incurred cost of any significance whatsoever. Taxability has never depended on approximating expenses to receipts; in fact, the less the cost, the greater the net income and the greater the tax burden.

9. Neither is it an answer to say that before the organization of Security Life the Banks did not receive income from credit insurance premiums and that, therefore, the emergence of Security Life did not change the situation so far as the Banks were concerned. For me, it very much changed the situation, for the controlled structure took over the insurance business and the premiums thenceforth were nestled within that structure.

10. Taxability, despite nonreceipt, is common in our tax law. It is present in a variety of contexts. For example, one has been held taxable, under the applicable statute's general definition of gross income, for income or earnings assigned to another and never received; [6] for the income from bond coupons, maturing in the future, assigned to another and never received; [7] for dividends paid to the shareholders of a transferor corporation pursuant to a lease with no defeasance clause; [8] for another's income from a short-term trust [9] (until § 673, with its 10-year measure, came into the tax structure with the 1954 Code); for the employer's payment of income taxes on his employees' compensation; [10] and for an irrevocable trust's income used to pay insurance premiums on the settlor's life,[11] or, in the absence of particular state law provisions, distributed to a divorced wife in lieu of alimony [12] (until § 215 came into the Code with the Revenue Act of 1942, 56 Stat. 817).

11. In the area of federal estate taxation an obvious parallel is found in the many instances of includability in the decedent's gross estate of property not owned or possessed by the decedent at his death. The Code itself provides for the inclusion of transfers theretofore effec-

---

[6] *Harrison* v. *Schaffner,* 312 U. S. 579 (1941); *Helvering* v. *Eubank,* 311 U. S. 122 (1940); *Burnet* v. *Leininger,* 285 U. S. 136 (1932); *Lucas* v. *Earl,* 281 U. S. 111 (1930). Cf. *Hoeper* v. *Tax Comm'n,* 284 U. S. 206 (1931); *Blair* v. *Commissioner,* 300 U. S. 5 (1937). See *Commissioner* v. *Sunnen,* 333 U. S. 591, 604–610 (1948); *United States* v. *Mitchell,* 403 U. S. 190 (1971).

[7] *Helvering* v. *Horst,* 311 U. S. 112 (1940).

[8] *United States* v. *Joliet & Chicago R. Co.,* 315 U. S. 44 (1942).

[9] *Helvering* v. *Clifford,* 309 U. S. 331 (1940).

[10] *Old Colony Trust Co.* v. *Commissioner,* 279 U. S. 716 (1929).

[11] *Burnet* v. *Wells,* 289 U. S. 670 (1933).

[12] *Douglas* v. *Willcuts,* 296 U. S. 1 (1935); *Helvering* v. *Fitch,* 309 U. S. 149 (1940); see *Commissioner* v. *Lester,* 366 U. S. 299 (1961).

tively made, but in contemplation of death, 26 U. S. C. § 2035; of a variety of *inter vivos* irrevocable transfers in trust, 26 U. S. C. §§ 2036–2038; and of joint interests, 26 U. S. C. § 2040, in all of which situations the ownership interest at death was nonexistent or less than full.

12. This demonstrates for me that there have been and are many examples of taxation of income without that "complete dominion" over it that the Court now finds so necessary. The quotation, cited by the Court, from Mr. Justice Holmes' opinion in *Corliss* v. *Bowers,* 281 U. S. 376, 378 (1930), consists of language used to *support* the taxation of income; it is not language, as the Court would make it out to be, that supported the nontaxation of income. The Justice's posture—and the Court's—in that case surely looks as much, and perhaps more, to includability here than it does to excludability.[13]

13. The Court shrinks from extending the possibility of taxation-without-receipt to the situation where the taxpayer is "prohibited from receiving" the income by another statute. It states that no decision of the Court has as yet gone that far. It is equally true that no decision of the Court has refrained from going that far.

---

[13] ". . . But the net income for 1924 was paid over to the petitioner's wife and the petitioner's argument is that however it might have been in different circumstances the income never was his and he cannot be taxed for it. The legal estate was in the trustee and the equitable interest in the wife.

"But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid. . . ." 281 U. S., at 377–378. In another case Mr. Justice Holmes said:

"There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. . . ." *Lucas* v. *Earl,* 281 U. S. 111, 114–115 (1930).

The Seventh Circuit has not been concerned with the existence of a prohibitory regulating statute, *Local Finance Corp.* v. *Commissioner,* 407 F. 2d 629 (1969), cert. denied, 396 U. S. 956, and this Court should not be. The Congress, in enacting the Life Insurance Company Tax Act for 1955, was of the opinion that § 482 was available to the Commissioner with respect to insurance companies that are captives of "finance companies." H. R. Rep. No. 1098, 84th Cong., 1st Sess., 7; S. Rep. No. 1571, 84th Cong., 2d Sess., 8.[14]

14. The Court's reluctance is reminiscent of the "claim of right" doctrine, which found expression in the unfortunate and short-lived (15 years) decision in *Commissioner* v. *Wilcox,* 327 U. S. 404 (1946), to the effect that embezzled income was not taxable to the embezzler. *Wilcox,* of course, stood in sharp contrast to *Rutkin* v. *United States,* 343 U. S. 130 (1952), where money obtained by extortion was held to be taxable income to the extortioner; it was overruled, at last, in *James* v. *United States,* 366 U. S. 213 (1961). In *Wilcox,* as here, the Court wrestled with the concept and imaginary barrier of illegality, was impressed by it, and, as in this case, concluded that illegality and taxability did not mix and could not be linked. That doctrine encountered resistance in *Rutkin* and in *James,* and was rightly rendered an aberration by those later decisions.

---

[14] "There is a potential abuse situation in the case of the so-called captive insurance companies. It may be possible for a finance company, for example, to establish a subsidiary life insurance company that will issue life insurance policies in connection with the business of the parent. If the subsidiary charges excessive premium on this business, a portion of the income of the parent company can be diverted to the life insurance company. It is believed that section 482 of the Internal Revenue Code of 1954 (relating to allocation of income and deductions among related taxpayers) provides the Secretary of the Treasury ample regulative authority to deal with this problem."

15. I doubt if there is much comfort for the Court in *L. E. Shunk Latex Products, Inc.,* 18 T. C. 940 (1952), for there the significant fact was that the taxpayer could not have raised its price even to a noncontrolled distributor.

In conclusion, I note that the Court of Appeals remanded Management Company's case to the Tax Court for consideration of the § 482 allocation, alternatively proposed, to that corporation. With this I must be content. At least Management Company is not a national bank, and the barrier that the Court has found in the missing § 92 supposedly does not provide a protective coating for Management Company or, for that matter, for Holding Company.

And so it is. The result of today's decision may not be too important, for it affects only a few taxpayers. It seems to me, however, that it effectively dulls one edge of what has been a sharp two-edged tool fashioned and bestowed by the Congress upon the Internal Revenue Service for the effective enforcement of our federal tax laws.