**WEST INDIES TRANSPORT CO., INC., Plaintiff**

v.

**DEPARTMENT OF FINANCE, GOVERNMENT OF THE VIRGIN ISLANDS, Defendant**

Civil No. 74/43

District Court of the Virgin Islands

Div. of St. Thomas and St. John

July 20, 1976

303

ATTORNEY GENERAL OF THE VIRGIN ISLANDS (ATTY. WILLIAM NEFF, of counsel), St. Thomas, V.I., *for plaintiff*

GRUNERT, STOUT, HYMES & MAYER, ESQS. (ATTY. RICHARD E. GRUNERT, of counsel), St. Thomas, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

OPINION

■ Again these disputants of long standing are before the Court in what, one dares to hope, is the last battle in their decade-long period of hostility. In Inter-Island Transport Line, Inc. v. Government of the Virgin Islands, Civil No. 463/1970 (D.V.I., Division of St. Thomas & St. John), which involved issues cognate to those encountered in the instant action, I made extensive findings[1] as to the real underpinnings of the controversy between the contestants there. As the plaintiff in that law suit and the petitioner here are, at the very least, in privity with each other, there is no need to duplicate those findings, and they are adopted herein by reference.

In order to attenuate to some measure the effects of the perennial water supply shortage in the Virgin Islands, the Government on May 1, 1967, entered into a one-year contract with West Indies Transport Co., Inc. (WIT), a corporation organized in the Virgin Islands, which provided for WIT to haul water from Puerto Rico to the Virgin Islands. On that very day WIT assigned the contract to Atlantic Transport Lines, Inc. (Atlantic) a shipping concern organized in Panama. The Government approved the assignment by letter dated July 5, 1967. Atlantic and WIT some months earlier had entered into a purported "agency agreement" whereby the latter was to perform

---

[1] At pp. 3 et seq.

various services as the former's "managing agent" in the Caribbean.[2]

This pattern continued, with minor variations, in the ensuing two years. A second one-year contract was executed by WIT and the Government on July 13, 1968, which was effective retroactively from May 1, 1968 until 1969. This contract was assigned to Atlantic on July 13, 1968, and was in turn assigned by Atlantic to Inter-Island Transport Line, Inc. (Inter-Island) another Panamanian shipping corporation. The third water-haulage contract again involved the Government and WIT as principals. Executed on June 25, 1969, the contract, for another one-year term, was assigned to Inter-Island on the same date. In these latter instances as well, the assignments were approved by the Government.

WIT, the petitioner here, reported the following income and loss figures on its tax returns for the fiscal years in question, i.e. 1967 through 1970:

| TAX YEAR ENDED | INCOME OR LOSS |
|---|---|
| Sept. 30, 1967 | $ (1,391.29) |
| Sept. 30, 1968 | (1,280.99) |
| Sept. 30, 1969 | 3,898.94 |
| Sept. 30, 1970 | 396.54 |

As obligated under the contracts, however, the Government paid the following amounts:

| TAX YEAR ENDED | PAYMENTS MADE |
|---|---|
| Sept. 30, 1967 | $226,799.84 |
| Sept. 30, 1968 | 619,949.08 |
| Sept. 30, 1969 | 743,047.55 |
| Sept. 30, 1970 | 476,697.41 |

---

[2] Clause (1) of the agency agreement set out the "Agents' Appointment & Territory." It read as follows:

"The Principal hereby appoints the Agent its Managing Agent in the Caribbean to handle all phases of a potable water transportation service between various islands, including the management of the Principal's vessels and the solicitations of the water contracts under the supervision of its General Agent, Oceanic Operations Corp. of New York."

The second agency agreement, referred to infra, contained an identical provision.

On October 31, 1973, the Tax Division of the Department of Finance transmitted a deficiency notice to petitioner informing it that its income tax liability was determined, for the subject years, in these amounts:

| TAX YEAR ENDED | DEFICIENCY |
|---|---|
| Sept. 30, 1967 | $ 33,837.31 |
| Sept. 30, 1968 | 336,322.11 |
| Sept. 30, 1969 | 406,245.20 |
| Sept. 30, 1970 | 253,912.57 |

Parenthetically, Atlantic and Inter-Island are exempt from the Federal income tax by virtue of 26 U.S.C. § 883.

Petitioner is before this Court seeking a redetermination, pursuant to 33 V.I.C. §§ 942–944, of the tax liability attributed to it by the Government, arguing that its tax returns for the subject years were accurate.

## I. NOTICE

The first argument the taxpayer presses is founded upon its theory that the notice of deficiency sent to it by the Government was defective in that it did not specify upon which theory the Commissioner was relying in assessing the deficiency against WIT. Thus, argues petitioner, the Government may not now rely upon the power of the Commissioner of Internal Revenue or his delegate, here, the Virgin Islands Commissioner of Finance (the "Commissioner") to allocate income between or among controlled corporations so as to prevent evasion of taxes or to clearly reflect income, pursuant to 26 U.S.C. § 482.[3] Indeed the

---

[3] That section reads:

"482, Allocation of Income and Deductions Among Taxpayers

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

first formal and specific notification of taxpayers by the Government that the latter was implementing section 482 came by way of counsel for the Government in his opening statement at the trial of this cause.[4] In his opening statement, counsel for the respondent noted that the Government would support its determination of deficiency by reliance upon "two somewhat interrelated sections" of the Internal Revenue Code, §§ 61 and 482. The petitioner objected, urging that it had no forewarning that § 482 was to be used, and that the Government should thus be foreclosed from proceeding with its case in reliance on that section. The objection was overruled. Petitioner now comes armed with legal authority in an attempt to persuade this Court that it may not consider the respondent's 26 U.S.C. § 482 theory. The taxpayer cites three cases in this regard: Commissioner of Internal Revenue v. Chelsea Products, Inc., 197 F.2d 620 (3d Cir. 1952); United States v. First Security Bank, 334 F.2d 120 (9th Cir. 1964); and Maxwell Hardware Company v. Commissioner of Internal Revenue, 343 F.2d 713 (9th Cir. 1965).

In all three of the above cases, the Commissioner had failed to specify his intended use of section 482 in the notice of deficiency to a taxpayer. Each court held that, on the facts there involved, the Commissioner was precluded from reliance on that theory.

Of course, of the three cited cases the one with the most precedential value for us is Chelsea, as it is a decision emanating from the United States Court of Appeals for the Third Circuit. In that case Chief Judge Staley, speaking for the Court, noted that because of the lack of specification of intent to rely on section 482,

---

[4] The notice of deficiency specified reliance upon no particular statute. Rather, it attached to the notice handwritten schedules of payments which had been made by the Virgin Islands Government to WIT and Inter-Island (as assignee) in the appropriate years. As these payments were not reported as income, continues the notice, they were included as "additional" income to WIT.

[T]he deficiency notices were thus deceptive and gave no notice that the Commissioner was proceeding under Section 45.[5] Since Section 45 grants the Commissioner discretionary powers the burden falls upon the taxpayer to prove that the Commissioner's determination is arbitrary . . . [citing cases] . . . This considerable power given the Commissioner certainly carries with it the correlative duty to give the taxpayer fair notice in advance of hearing that the Commissioner has proceeded under Section 45. The taxpayer can hardly shoulder its burden if it does not know the Commissioner has proceeded under Section 45 or if it does not know which transactions or group of transactions the Commissioner has determined to have resulted in distortions of true net income.

■ I take particular note of the last sentence in the preceding quotation. I understand it to allow reliance upon section 482 if the taxpayer *does know* of the particular transactions, or group of transactions at which the Commissioner has taken aim. In the situation at bar, the taxpayer certainly was aware of which transactions the Commissioner was subjecting to scrutiny in view of the explanatory schedules which were attached to the notice of deficiency. Despite the protestations of its counsel, I find that the petitioner recognized that respondent, in pursuing the income derived from these water haulage contracts, of necessity had to rely upon *some* theory, and under the circumstances, i.e. the apparent shifting of income from a domestic, taxable corporation to two foreign, tax-exempt corporations, the assignment-of-income theory (§ 61)[6] and/or reallocation (§ 482)-of-income theories were indicated. I further base my belief that the petitioner had ample notice on the fact that WIT and agents for the Department of Finance had corresponded with each other relative to the issue of who in fact earned the income, and as to the consideration for the assignments discussed infra. And,

[5] Section 45 of the Internal Revenue Code of 1939 is the substantially similar precursor to the present section 482.
[6] I.R.C. § 61 is definitive of gross income. Lucas v. Earl, 281 U.S. 111 (1930) is the landmark case which established the assignment-of-income principle.

although the case is not controlling, I find the following analysis of the Chelsea principle persuasive:

Although the most appropriate items to advise the taxpayer of the Commissioner's theories to sustain an assessment would be first in the notice of deficiency and then in the Commissioner's answer, we do not hold that the Commissioner necessarily loses his right to pursue a theory or Code section that is not specifically raised *before or at trial*. The basic consideration is whether the taxpayer is surprised and disadvantaged when the Commissioner has failed to plead section 482. (Emphasis supplied.)

Commissioner of Internal Revenue v. Transport Manufacturing and Equipment Co., 478 F.2d 731, at 736 (8th Cir. 1973); see also Nat Harrison Associates, Inc., et al. v. C.I.R., 42 T.C. 601 at 617 (1964).

Because it is my view that petitioner was not surprised and disadvantaged in any prejudicial way, I hold that the Government was not precluded from reliance on 26 U.S.C. § 482.

## II. APPLICABILITY OF SECTION 482

### A. THE AGENCY AGREEMENTS

We return to a discussion of the agency agreements. There were two, both essentially identical as to wording. The first became effective commencing with the first day of December, 1966, and was between Atlantic and WIT. The second, effective March 1, 1969, was between Inter-Island and WIT. Clause (3) of each contract embodied the duties which were to be undertaken by WIT. It read as follows:

(3) GENERAL DUTIES: The Agent shall for the Principal's account manage and conduct the business of the Principal in the Agent's territory. Its duties shall include the activities of a husbanding agent, a contract carrier's agent, and an owner's representative. This includes but is not limited to arranging for advertising, solicitation, insurances, making cargo and ship contracts, negotiating and settling claims, arranging all necessary operations in berthing, loading, discharging, bunkering, and dispatching vessels; stevedoring, checking, watching, clerking, receiving and delivering

cargoes, attending to crew's requirements, ship's repairs and maintenance; ordering deck, engine and stewards stores and spare parts, preparing and filing from time to time with proper Government or Local Authorities such tariffs, or other information as may be required by law.

Clause (4) of each contract authorized WIT to sign contracts and other documents on behalf of its respective principal. This clause directed that all such documents be signed in the principal's name, identifying the agent. Clause (1) of the pacts required that WIT collect all amounts due the principal on the principal's behalf, and to maintain separate bank accounts for the principal's funds. Under the agency agreements WIT was to receive, for services rendered to Atlantic, $2,500 per month, and for services extended to Inter-Island, $3,000 monthly. In both instances the agreed-upon compensation could be adjusted by mutual agreement of the parties, although it does not appear from the evidence that this provision was ever really utilized.

## B. COMMON CONTROL

Respondent's position is that WIT, Atlantic and Inter-Island were commonly controlled. Its first premise is the theory of collateral estoppel. By virtue of language I employed in the Inter-Island Transport Line, Inc. v. Government of the Virgin Islands case, supra, WIT should be estopped from denying that it, Inter-Island and Atlantic are one and the same, and a fortiori under common control, maintains the Government. As the existence of common control may be founded upon a basis other than that of collateral estoppel, I need not decide that particular issue.

As an alternative basis for a finding that these corporations were commonly controlled, the Government refers this Court to the pertinent facts herein involved. From the Government's standpoint, the corporations were so closely

allied as to preclude a finding other than that they were commonly controlled.

From the testimony, on cross-examination of W. James Oelsner, Secretary and Director of WIT, it appears that WIT was, at all pertinent times, owned by Oceanic and Finance Corporation, a corporation organized and based in the Republic of Panama. A New York corporation, Oceanic Operations, [7] acted as general agent for Atlantic and Inter-Island, and according to the terms of the agency agreements it was to act in a supervisory capacity over WIT. Oceanic Operations, according to Mr. Oelsner, was owned by the Continental Shipping Corporation, a concern which in turn was owned by one Carl Janson, Sr.

The name Janson is of singular significance to this petition. In addition to owning (in his own right or through his family) Continental Shipping Corporation, which owned Oceanic Operations, Carl Janson was one of the directors of the latter. Mr. Janson was also the president and director of West Indies Transport, Limitada, a Panamanian corporation, and it was that corporation to whom WIT passed its material on ownership matters and its financial returns through Oceanic Operations in New York. Further, when asked about the identity of the owners of Atlantic and Inter-Island Mr. Oelsner testified on cross-examination that he was unable to remember the names. However, when asked whether one would be correct in saying that "in dealing with the ownership of West Indies Transport, in dealing with Atlantic, and dealing with Inter-Island, [he] dealt with the same man in Panama, Mr. Janson", Mr. Oelsner responded in the affirmative.

Relative to this point the Government introduced into evidence an affidavit of one John J. Mullin, of the United

---

[7] See footnote 2, supra. Mr. Oelsner was also an employee of Oceanic Operations.

States Consulate in Panama. In the affidavit, dated June 15, 1972, the affiant attempted to trace in brief the histories of West Indies Transport, Limitada, Atlantic Transport Line, Inc., and Oceanic and Finance Corporation. Essentially, West Indies Transport, Limitada was organized on November 17, 1967. Its original board of directors consisted of Carl E. Janson, President, director and legal representative, and others. In December, 1971, a new board of directors was elected, with Carl E. Janson remaining in the same capacities. Nils Janson and Michael Janson were elected as directors, and Britmarie Janson de Pedreschi was to serve as Vice President and Secretary. Atlantic Transport, Inc., was organized on June 13, 1960. The original board of directors consisted of Carl Axel Janson, who also acted as president, and others. In January, 1968, a new board of directors was installed, comprised of Carl A. Janson, Michael Janson, Nils Janson and Janne H. de Janson. Oceanic and Finance was organized on June 10, 1959. Its directorate was composed of Carl A. Janson, along with others.

Mr. Mullin noted that all three corporations had the same address. In addition, he stated that the Public Registry in Panama contained no information on any firm named Inter-Island Transport Corporation.

Counsel for the petitioner attempted to "clarify" the above by showing through the witness on redirect that whenever there was contact between Mr. Oelsner for Oceanic Operations, on the one hand, and Mr. Janson for Atlantic, Ocean and Finance Corporation and Inter-Island on the other, Mr. Janson was acting as an agent for the particular company; the inference being that Mr. Janson never acted in an ownership capacity with respect to these Panamanian entities. Petitioner's position in this regard is that there is insufficient basis for a finding that Atlantic,

Inter-Island, and WIT were under common control. This contention I find to be unacceptable.

■■ "Control" for purposes of 26 U.S.C. § 482 is defined in the Treasury Regulations promulgated by the Internal Revenue Service, 26 C.F.R. § 482-1, subsections (a)(3) and (4).[8] Although "control" in the corporate context is generally connotative of a majority of the beneficial or record ownership of the common stock, the definition of the concept in the regulations is notably more expansive. Thus the Commissioner is empowered to scrutinize the very substance of a network of control, rather than being stymied in an instance where, perhaps, formal domination is not vested in the person or organization actually suspected by the Commissioner as enjoying and exercising real command. Grenada Industries, 17 T.C. 231, 254, aff'd 202 F.2d 873 (C.A. 5, 1953), cert. den. 346 U.S. 819 (1953); B Forman Company v. C.I.R., 453 F.2d 1144 (2d Cir. 1972); Ach v. C.I.R., 42 T.C. 114 (1964). Scrutinizing the facts under the bright light of 26 C.F.R. § 1-482 (1971), I am convinced that the relationship between these corporations falls within the regulatory definition of "common control". It appears that the Janson family had some interests in all three corporations, and had the capacity, through their ownership of Continental Shipping Corporation, which, in turn, owned Oceanic Operations, to direct the activities of WIT. I am particularly persuaded by Mr. Oelsner's acknowledgement that "in dealing with the ownership" of the respective corporations, Mr. Janson was,

---

[8] The regulations provide at 26 C.F.R. § 482-1(a)(3) & 4:

(3) The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

(4) The term "controlled taxpayer" means any one of two or more organizations, trades or businesses owned or controlled directly by the same interests.

314

essentially, the sole contact.[9] Indeed, Mr. William Hurst, who served as president of WIT during the relevant years, testified that he had never received any directions directly from anybody connected with Atlantic or Inter-Island. Rather, directions came, if at all, from New York, through Oelsner or through one Marion Dudek, both officers of WIT and Oceanic Operations as well.

If the above factors, standing alone, might not be sufficient to sustain a finding of common control, they, together with other factors developed throughout the course of the hearing, and coupled with my own conclusions as based upon my estimate of the credibility of the petitioner's witness, have persuaded me that the Government has satisfactorily established that the subject corporations were "commonly controlled" within the meaning of 26 C.F.R. § 1.482-1(a)(3) and (4). Whatever the existing confusion stemming from the earlier cases between these parties, I now squarely so find.

▓ Moreover, it should be noted that the Government is aided by a presumption of control where income or deductions have been arbitrarily shifted.[10] The pertinent regulation which supports this observation is perhaps based upon circular reasoning, but it appears to have been designed to aid the Commissioner when his ability to conduct a thorough investigation into the issue of common control is hampered by the factual circumstances of a given case, e.g. witness' failure of memory, impracticability or impossibility of acquiring pertinent evidence, etc.

## C. SHIFTING OF INCOME

Was there, then, an arbitrary shifting of income[11] in this case? I conclude that there was.

---

[9] Although Mr. Oelsner attempted to clarify this statement, see p. supra, I am not bound to give his endeavor unqualified credence, and I have not done so.

[10] See the final sentence of 26 C.F.R. § 1.482-1(a)(3)(1971), cited supra at fn. 8.

[11] There is no involvement with deductions here.

■ As noted earlier, section 482 is a weapon of wide scope with which the Commissioner is armed for the purpose of insuring that a controlled taxpayer be on a tax parity with an uncontrolled taxpayer. Commissioner of Internal Revenue v. First Security Bank of Utah, 405 U.S. 394, 400 (1971). This end is to be accomplished, the Treasury Regulations provide,

. . . by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer . . .

. . . The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arms length with another taxpayer.[12]

If then the dealings between WIT and Atlantic, or WIT and Inter-Island did not measure up to the standard of "arm's length transaction(s)", the threshold questions whether the presumption of control arises and whether the Commissioner may allocate at least some of the income between the subject corporations must be answered in the affirmative.

As pointed out before, WIT acted as agent for Atlantic and Inter-Island. According to the agency agreements, WIT was to solicit water-haulage contracts on behalf of its principal, along with the discharge of many other duties. Seemingly, the parties are agreed that agency arrangements, whereby many of the day-to-day chores and obligations of an owner or charterer of a vessel(s) are undertaken by the agent, are common in the shipping industry.[13] In these particular agreements, the agent was

---

[12] 26 C.F.R. § 1.482-1(a)(6)(1971). Professors Bittker and Eustice note that section 482 is designed to prevent "artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises". B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders. p. 15–21 (3d ed. 1971).

[13] Mr. Oelsner stated that there are sound and practical reasons for such arrangements. Through these arrangements an agent at a certain port or area far removed from the principal's base pays the crew, arranges for ship repairs and maintenance, negotiates and settles claims, and performs a host of other functions without requiring the principal to "spread himself too thin."

to sign all documents, including contracts, in the name of the principal while identifying the agent's status as agent. Yet in each of the water-haulage contracts in issue, WIT signed in its own right, not disclosing either its then principal or its capacity as agent. Mr. Oelsner explained that this was done in each instance because the Virgin Islands Government preferred to deal with a concern based in the Virgin Islands. Each contract, Oelsner maintains, although signed in the name of WIT, was intended from the first to be assigned to its principal. WIT had, at the beginning of the four-year period in 1967, only about $5,000 and could not possibly have performed the water-haulage contracts as it neither owned ships nor had vessels under charter. Atlantic and Inter-Island, which were already engaged in the water-haulage business in the area of Virgin Gorda, had access to ships which would serve this purpose by virtue of charters. It is petitioner's contention, at least with respect to the second and third water-haulage contract, that the Government was well aware of the existence of Atlantic and Inter-Island respectively, and of the fact the contracts were in actuality being negotiated on behalf of these Panamanian corporate beings to whom the contract would be assigned immediately upon execution. This very method of doing business, however, cast a suspicious light on these transactions.

It is the assignments which, from my perspective, have proved to be the factor most damaging to the petitioner's case. On cross-examination Mr. Oelsner was asked whether he expected that Atlantic would make a profit on the first water-haul contract. Although there is some dispute as to whether he registered a negative or affirmative response, when pressed as to what general range of estimated profits WIT had established would be forthcoming to its principals

upon that and the remaining two contracts, Oelsner waxed increasingly and markedly evasive. His proffered explanation was that he could not clearly answer the questions as to Atlantic and Inter-Island because his (WIT's) connections with these companies were too tenuous. As for the value to WIT, he responded that the value of the contracts to that corporation was that without them it could not have been the agent for Atlantic and Inter-Island.

I need not accept that logic. As respondent correctly contends, the water haul contracts must have had some economic value. Even the first contract, which petitioner claims was of speculative worth,[14] had to be considered by "both" WIT and Atlantic as being of some monetary account, as the Government was obligated under the first contract to purchase a monthly minimum of 30,000 tons of water from WIT at the rate of $.80 per ton. The second and third contracts obligated the Government to pay even more.[15] Yet petitioner maintains that the consideration it received for the assignment of its rights and duties under the contract was "its compensation from the agency agreements". Because I am persuaded that WIT, for whom Oelsner (in his dual capacity as an officer of WIT and an employee of Oceanic Operations) negotiated the first contract with the Government, expected that the undertaking would yield a profit, it staggers the imagination to believe that a corporation which signed such a contract in its own capacity would, in dealing with another firm on an arm's length basis, fail to exact a higher price for the assignment of those contracts rights. A fortiori, in the case of the second and third contracts, where all the parties had benefit of the vision of hindsight to perceive the continuing need of the Virgin Islands Government for water and the

---

[14] Because it was for only one year.
[15] Min. 30,000 tons per month each year at $1.20 and $1.35 per ton, respectively.

318

vast sums of money received by the principal,[16] it seems clear that were the parties to the assignments dealing at arm's length each would have endeavored to enhance its own chances of making a profit, and the conflicting forces, clashing at the negotiating table would, in all probability, have resulted in WIT coming off to more than the illusory "value" it received from the assignment of those contracts. Moreover, in the case of second and third contracts, where the Government was allegedly aware that Atlantic and Inter-Island had actually performed the contractual duties, why could not Atlantic and Inter-Island have entered into the contracts on their own behalf, without having their purported "agent" sign the contracts, thus eliminating the meaningless formality of an assignment? Certainly by this time the Government could not be thought of as standing on its supposed preference for dealing with a local organization. Petitioner, though making a valiant effort, has failed to satisfactorily answer this question. This is a case in which the presumption of control should attach; it has not been overcome.

 Rather, it appears that WIT was set up for the express purpose of serving as the agent of Atlantic and subsequently Inter-Island. That this may have been a legitimate business purpose is beyond doubt. Nonetheless, it is a strong indication of the existence of common control, and, in cases in which a section 482 determination is utilized by the Commissioner, it is the taxpayer upon whom the burden of proof rests. That burden has been interpreted to be to show

... that the Commissioner's assessment is arbitrary and ... what the proper assessment should have been ...

---

[16] Although the Government's checks at times were drawn to Atlantic and Inter-Island, respectively, when brought to the Government's attention the errors were corrected and Atlantic and Inter-Island were designated as the payee in the appropriate case. Over the course of the contract the Government paid in excess of $2,000,000.

Engineering Sales, Inc. v. United States, 510 F.2d 565, 569 (5th Cir. 1975). See also Crosby v. United States, 496 F.2d 1384 (5th Cir. 1974), and cases therein cited. The Commissioner's determination is aided, then, by a presumption of correctness, and the determination is reversed only upon a showing that it was arbitrary and unreasonable. The presumption cannot be overcome save by a showing of what an arm's length transaction would have yielded. See, generally, 26 CFR § 1.482-1(b)(1)(1971). In this regard the United States Court of Appeals for the Fifth Circuit has stated:

No amount of self-examination of the taxpayer's internal transactions alone could make it possible to know what prices or terms unrelated parties would have charged or demanded. We think it palpable that, if the standard set by these unquestioned regulations is to be met, evidence of transactions between uncontrolled corporations unrelated to [the taxpayer] must be adduced in order to determine what charge would have been made for the performance of ... services [for the related entity].

Lufkin Foundry & Machine Company v. C.I.R., 468 F.2d 805, 807 (5th Cir. 1972): See also Spicer Theater v. C.I.R., 346 F.2d 704, 706 (6th Cir. 1965); cf. Hall v. C.I.R., 294 F.2d 82 (5th Cir. 1961).

In Lufkin, the taxpayer (Lufkin), a Texas corporation, sold its oil field machinery to a wholly owned Texas subsidiary, which in turn resold the machinery throughout the Western Hemisphere exclusive of the United States. The Texas subsidiary received a discount of 20 percent off list price for all the machinery it resold to a wholly owned Canadian subsidiary of Lufkin. The Canadian subsidiary received a ten percent discount from the Texas subsidiary. Lufkin paid a commission of 20 percent of the net invoice price to its Texas subsidiary for the latter's remaining sales. A third subsidiary based in Venezuela also received a 20 percent commission for its sales. It sold machinery primarily in South America.

The Commissioner, pursuant to section 482, allocated to Lufkin 50 percent of the commissions paid to the Texas and Venezuelan subsidiaries, and 50 percent of the discount given to the Texas subsidiary for its sales to the Canadian subsidiary. In the Tax Court, Lufkin presented evidence prepared by an independent certified public accountant as to the reasonableness of the discounts and commissions, taking into account the vicissitudes inherent in the manner in which Lufkin transacted its international business. Although the Tax Court held that such evidence was sufficient to overcome the Commissioner's presumption of correctness, the United States Court of Appeals for the Fifth Circuit, employing reasoning exemplified by the quoted passage, reversed.

In the instant case the amount of compensation paid under the agency agreements is also suspect. Under the agreements WIT was to perform many duties under the water-haulage contracts. See p. 310, supra. Atlantic and Inter-Island did charter the vessels used to haul the water, but the president of WIT testified that Atlantic and Inter-Island did little else than reimburse WIT for the expenses it incurred in discharging its duties. Over the course of the contracts the Government paid in excess of $2,000,000. In such circumstances, I think it reasonable to infer that even an agent, whose business it is to provide nothing but agency services, would have demanded a great deal more of its principal for such services, had they been dealing on an arm's length basis, than the $2,500 to $3,000 per month WIT received.

Here the only evidence relative to this matter proffered by the petitioner was Mr. Oelsner's opinion that the fees paid for WIT's services under the agency agreements were reasonable in the light of industry practice, and that the consideration for the assignments of the water haulage contracts was their compensation under those agreements.

■■ Based upon my earlier conclusions that petitioner had notice that the Commissioner's allocation of all the gross income on the water haulage contracts was premised upon a section 482 determination, and that there was common control among WIT, Atlantic and Inter-Island (and that the petitioner has failed to overcome the presumption of control), and upon petitioner's failure to present probative evidence of analogous transactions at arm's length, I further find and conclude that the Commissioner's determination was not unreasonable and to that extent he was empowered to allocate some of the income received by Atlantic and Inter-Island to WIT.[17]

## D. AMOUNT OF ALLOCATION

■ The question remains: how much of that income should have been allocated to WIT. The Government maintains that all of the income should be attributed to WIT, as the latter has not met its burden of proving what the proper allocation should have been. I do not agree. I am convinced of and I am certain that the Government recognized as well, the existence of Atlantic and Inter-Island. From the evidence, it appears that the Government believed that Atlantic and Inter-Island did perform some function with respect to the contract. The chartering of the ships necessarily involved some risk-taking on their part, but how much has not been established. In other words, the assignments, though supported by questionable considera-

---

[17] I pause to note that petitioner's reliance upon C.I.R. v. First Security Bank of Utah, N.A., 405 U.S. 394 (1972) is not well founded. That case is distinguishable. While the Court recognized that "there is nothing sinister in so arranging one's affairs so as to keep taxes as low as possible" citing Judge Learned Hand's dissent in C.I.R. v. Newman, 159 F.2d 848, 850–851 (2d Cir. 1947), the facts of the case before them were not those presented here. There, premium income earned by an insurance company wholly owned by two taxpayer banks could never be enjoyed by the banks without violating federal law. There was thus no arbitrary shifting of income, as I have found to have occurred here. Moreover, it is axiomatic that the Commissioner may apply the provisions of section 482 even if the motivation behind the shifting of income is innocent—the purpose of the statute being, among others, to clearly reflect income.

tion, do not appear to have been mere sham.[18] Petitioner has thus proved that the allocation of *all* the gross income derived from the contracts was unreasonable.

 I have determined that the Government, through the Department of Finance, should have allocated to WIT first what would have amounted to an arm's length charge for the assignments and second, an arm's length value for the compensation it should properly have received. This matter must therefore be returned to the Department of Finance, thus effectively dispelling the hope expressed at the outset to the end that its allocation reflect such arm's length charge and price as would be appropriate under the guidelines of 26 CFR § 1.482-2.[19] Cf. Nat Harrison Associates, Inc. v. C.I.R., supra.

---

[18] This disposes of the respondents' assignment-of-income theory, which was based upon § 61 of the I.R.C. and Lucas v. Earl, supra.

[19] The parties are agreed that the amounts shown in the deficiency notification reflect gross income. Although this Court has jurisdiction to determine the correct amount of the deficiency, see 33 V.I.C. §§ 942–944; 5 V.I.C. App. V R 14, there is insufficient data here upon which to do so. The Department of Finance is in a better position to compute the deficiency based upon an audit of petitioner's returns as adjusted to clearly reflect net income and deductions.