**Lester GOLD, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 79–W–97.**

United States District Court, D. Colorado.

Feb. 19, 1982.

Richard R. Helmick, Denver, Colo., for plaintiffs.

Marshall I. Whitley, Atty. Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

WINNER, District Judge.

Jurisdiction of this tax refund suit is admitted, and the parties have settled all except three of their disputes. The unsettled issues are:

1. Whether money paid in connection with an assignment and reassignment of certain mining claims should be taxed as capital gain realized from a sale or as ordinary income resulting from a payment made for an unexercised option. [The parties refer to this transaction as the "Pasco Agreement" and they refer to the properties as the "Redwell Prospect", and I shall adopt that terminology in this opinion.]

2. Whether a Section 482 reallocation of expenses and income of related corporations was proper and whether there were constructive dividends to the stockholders.

The IRS reallocated certain expenses of Lakewood Chrysler-Plymouth, Inc. to Roger Mauro, Inc., saying that the true incomes of the corporations were distorted. By the reallocation, the income of the big money-maker, Lakewood Chrysler-Plymouth, Inc. was increased. The IRS then ruled that individual plaintiffs had thus received a constructive dividend.

3. Whether money claimed by plaintiffs to be a loan was in fact a capital contribution to Grand Prix Imports, Inc., making a subsequent distribution of part of that amount a dividend rather than loan repayment.

■ The parties have filed a long, written stipulation of facts, and that stipulation is incorporated herein by reference. It is my understanding that this can be done as to stipulated facts, and that Rule 52 does not require that those agreed facts be set forth in the court's findings. 9 Wright and Miller, Federal Practice and Procedure, § 2579; *Nuelsen v. Sorensen,* (1961) 9 Cir., 293 F.2d 454; *Jones v. New York Cent. R. Co.* (1950) 6 Cir., 182 F.2d 326. Moreover, plaintiffs moved for summary judgment on all three disputed claims and defendant joined in the motion on the second and third claims. Because I agreed that at least the first claim included genuine issues of material fact, the case was tried on the first issue and I shall make findings on those fact issues. Apart from the disputed fact issues, I shall set forth only the ultimate facts which I hope will make this opinion understandable. The disputes will be discussed in the order set forth above, but, prefatory to reaching the specific differences, it is to be noted Lester Gold and Shirley Gold have filed joint returns as have Harry Cohen and Marie Cohen for the calendar years 1971, 1972 and 1973, the years in dispute. The taxpayers will be referred to collectively as plaintiffs, because their rights are identical.

1. The capital gain vs. ordinary income dispute arising under the Pasco Agreement dealing with the Redwell Prospect.

■ Originally defendant said that it would file a summary judgment motion on

this dispute, but its brief said that the matter couldn't be determined on summary judgment because intent was part and parcel of the argument, and intent is a question of fact. That brought about the short trial which was held.

Briefly, the stipulated facts show that a group of investors owned several mining claims near Crested Butte, Colorado, and the Redwell Prospect was one of sixteen potentially commercially valuable deposits described in a June 1, 1968, agreement [The "Pilot Agreement."] The parties refer to the resultant owners of the Redwell Prospect as "Investors-Pilot." Investors-Pilot entered into a long written agreement with Pasco Minerals, Inc. [the Pasco Agreement] and it is this agreement which gives rise to this phase of the case. Following the provisions of paragraph 2.6 of the Pasco Agreement, in September, 1971, Investors-Pilot assigned 20% of the Redwell Prospect to Pasco, and Pasco paid Investors-Pilot $600,000.00. This assignment was duly recorded in Gunnison County, Colorado, and at that point, under Colorado property law, there was an accomplished transfer of title to the 20% interest. Thereafter, as required by the Pasco Agreement, five monthly installments of $40,000 each were paid to Investors-Pilot by Pasco, and Pasco paid another $30,000 for the benefit of Investors-Pilot. A change in ownership and management policies occurred, and Pasco decided to back out of the Redwell Prospect. Accordingly, it reassigned to Investors-Pilot the 20% interest theretofore conveyed to it. This reassignment was made pursuant to provisions in the Pasco Agreement which, in effect, permitted Pasco to reconvey, forfeiting the payments theretofore made with stipulations in the agreement that the payments made amounted to liquidated damages. By March, 1972, when the reassignment was made, a total of $860,000.00 had been paid to or for the benefit of Investors-Pilot pursuant to Pasco's contractual obligations, and this amount taxpayers reported as capital gain. The IRS, on the other hand, says it was ordinary income, and this is the Redwell Prospect argument explained in capsulized form.

The paperwork with which we are dealing is long and difficult to understand. However, study has convinced me that the transaction may fairly be compared with one of two real estate transactions frequently used in Colorado. Those frequent transactions are:

1. A Receipt and Option Agreement under which a prospective purchaser ties up the real estate for a short period of time, reserving to the purchaser the right to forfeit a relatively small deposit if the purchaser has a change of heart. Typically today, not even the small deposit is lost if the purchaser can't get financing, and, of course, the deposit is returned if title isn't merchantable. [See, *Stelson v. Haigler,* 63 Colo. 200, 165 P. 265, discussed infra.]

2. A conveyance of real estate to a purchaser and the execution of a deed of trust back to the grantor, with a proviso that there can not be any deficiency judgment on foreclosure. [The Soldiers and Sailors Relief Act added this provision to all real estate transactions covered by the Act.]

A receipt and option agreement is almost never recorded. A deed with a deed of trust back is almost always recorded. A receipt and option agreement usually has a small deposit which ties up the property for a short time. A deed with a deed of trust back requires a larger payment and it is for a much longer duration. A receipt and option agreement conveys no title, but, of course, a deed does convey title. Under a receipt and option agreement, an owner continues to pay taxes and insurance. Under a deed with a deed of trust back, the grantee pays taxes and insurance. A receipt and option agreement gives a right to purchase while a deed uses words of conveyance. A receipt and option agreement imposes no contractual obligation on a purchaser. A deed with a deed of trust obligates the purchaser, even though provision may be made for a reconveyance without right to a deficiency.

Under all of these tests, the Pasco Agreement is fairly comparable to a deed with a deed of trust back, and it is not comparable to a receipt and option agreement. The Revenue Agent relied on *Stelson v. Haigler,* 63 Colo. 200, 165 P. 265, but I think that the case supports the contentions of plaintiffs rather than those of the government. There, Haigler sued for a commission, and all Haigler had done was to get $1,000 from another real estate broker to tie up $131,000 worth of land. No tender of payment of any other money was ever made, and no deed was ever executed.

In *Stelson v. Haigler* there wasn't anyone who was shown to be interested in acquiring the property; there was no tender of any amount in excess of the $1,000, and the broker assumed no obligations. Most assuredly, there wasn't a conveyance of any title. That is hardly the case here. If Pasco hadn't paid the $600,000 plus money paid for the benefit of sellers, sellers could have brought suit to collect. There was a binding contractual obligation to pay that amount. The contract contained a back out provision only after more than one-half of the purchase price was paid. Moreover, there was no automatic termination as is the case with an option agreement. An affirmative reassignment was required, and, absent the reassignment, Pasco would owe the entire amount. Additionally, the language couldn't have been clearer as to the result intended. The contract says that "Sellers . . . agree to sell to Pasco and Pasco . . . agrees to buy from Sellers an undivided . . . 20% interest." The Pasco Agreement was a sales agreement supported by a very large downpayment, large installment payments, and a back out provision which required affirmative action on the part of Pasco. Why new management of Pasco wanted out is something which is unclear, but it may well be that new management didn't want to get into the mining business with the mine located at 10,000 feet or that new management didn't hold out the same hopes for the Redwell Prospect as did old management. The record shows that it is common in the mining business to sign sales contracts such as the Pasco Agreement; that on transactions this large, the purchasing company doesn't want to have to show the unpaid balance on its balance sheet, but that typically the parties treat and intend these deals as sales of capital assets. Without considering the parties intent which consideration the government said required the trial in this case, I think that the transaction was a conveyance of an interest in real estate coupled with a subsequent conveyance back to limit the grantee's liability to the amount paid before the voluntary reconveyance. However, I went along with defendant's request for the evidentiary hearing because I agree that intent is controlling and that it is a question of fact. Relying on the testimony I heard, I unhesitatingly find that the parties—Investors-Pilot and Pasco—both intended that the Pasco Agreement was a conveyance of a 20% interest in the Redwell Prospect with substantial contractual obligations on Pasco, but with an agreement to accept a reconveyance to Investors-Pilot without imposition of further damages on Pasco and without the right to seek specific performance of the remainder on the agreement. The loss voluntarily assumed by Pasco was a loss of more than half of the purchase price, and Investors-Pilot got the property back. Had there been a deed with a deed of trust back, Colorado law would not permit strict foreclosure, and it is improbable that a Colorado court would have approved a public trustee's sale which resulted in a loss of the dollar amount Pasco gave up. The back out language of the Pasco Agreement was a limitation on remedies available to Investors-Pilot which did not change the nature of the transaction. The Pasco Agreement was a contract for a sale of an undivided 20% interest in the Redwell Prospect, and, later, new management of Pasco decided to convey the property back to Investors-Pilot and take the loss. The transaction was a sale and a reconveyance of a capital asset.

■ Defendant takes a secondary position that even if the Pasco Agreement was an agreement of purchase and sale, some part of the purchase price should be allocated to the 30% interest which wasn't con-

veyed and which was tied up. At time of trial the government called an IRS employee to testify as an expert on whether the Pasco Agreement was an option contract or a contract of sale. The witness was Ganesh C. Bhujan, and I learned that he is a mining engineer. Mr. Bhujan had a severe language barrier, because his native language is Assamese which, he said, is "the language of part the India." I was underwhelmed with his experience and with his qualifications to testify. This was so when he, a mining engineer who has great difficulty with the English language, was asked to express a legal opinion which was based on no study of the law and on no demonstrated real experience in the mining industry. When he got to trying to assign a value to the 30% future interest, I completely lost him—especially when he tried to do something with a royalty payment on a mining prospect which had never operated. It was finally agreed that he would "testify" in writing, and defendant's exhibit TS–9 was received as his testimony. I find it to be unintelligible and the government's lawyers must share my confusion because they totally disregard their only witness and in their brief they "testify" to a newly conceived theory of counsel. I find counsel's argument to be no more convincing than their expert's testimony, and I don't think that any part of the money received by Investors-Pilot should be allocated to anything other than the undivided 20% interest which was conveyed to Pasco and was by Pasco assigned back to Investors-Pilot. By some sort of argumentative legerdemain the IRS says that 31% of the $860,000.00 was paid for the 30%, but I don't think so, and I find that the businessmen who worked out this complicated deal intended that all of the money paid by Pasco was paid for the sale of the 20% interest. The arguments of government counsel are wild speculation, unsupported by any evidence in the record.

2. The Section 482 reallocation of Lakewood Chrysler-Plymouth expenses to Roger Mauro, Inc. dispute.

Section 482 of the Internal Revenue Code gives the Commissioner discretion to reallocate expenses and income among controlled corporations to reflect true net income. He is given discretion, but it is not an unfettered discretion. At the outset, I mention that Lakewood Chrysler-Plymouth and Roger Mauro, Inc. fit within the definition of controlled corporations and I think no discussion of this finding is required. For the tax years in question, Lakewood Chrysler-Plymouth had annual sales of between $8-million and $11-million. For the same years, Roger Mauro, Inc. had gross sales of between $176,000 and $186,000, with an average comparative relationship of approximately 1.5%. Roger Mauro was the individual primarily responsible for the business affairs of Lakewood Chrysler-Plymouth, and it was decided to open a body shop and a motor home business. The automobile dealership had a good track record, and a business decision was made not to clutter up its financial statement with the risks of an untried business. Lakewood Chrysler-Plymouth conducted its business on a 7-acre site, and Roger Mauro, Inc. was permitted to use a very small area without payment of rent. Additionally, Roger Mauro charged Roger Mauro, Inc. nothing for the almost infinitesimal amount of time he spent looking over the affairs of the fledgling company. On these facts, the District Director, acting under Treasury Regulations 1.482–2(b), et seq., reallocated expenses of Lakewood Chrysler-Plymouth to Roger Mauro, Inc. The issue is phrased in the government's brief:

"Accordingly, the question presented is whether the amounts reallocated by the Service reflect an arm's length charge. The Service reallocated three items of expenses between the two corporations. First, the operating expenses of LWCP were reallocated between the two corporations to reflect a greater portion attributable to RM. In making this allocation, the Service determined that the portion of LWCP's operating expenses attributable to RM should be equal to the percentage of the combined gross sales of the two corporations attributable to RM. As

a result, the percentage of LWCP's operating expenses attributable to RM was increased from roughly .01 percent for each year to 1.88 percent, 1.81 percent and .03 percent for 1971, 1972 and 1973 respectively. Secondly, the Service allocated officers' and managers' salaries equally between the two corporations. And thirdly, management expenses of $1,000 per month were charged to RM."

The justification for saying that there is a logical relationship of expenses in one corporation to the expenses of another corporation is, quite understandably, unexplained. I am sure that the IRS would take a dim view of a tax return which claimed business expenses based on the relationship the expenses of some other company bear to its gross sales. A retail grocery chain is lucky to earn 1% on sales, but personal service companies frequently net 25% on sales. All the IRS has to do is to study government publications to prove that the expenses of one company as compared to sales don't bear much relationship to the expenses of another company in a different business compared to its sales. Here, Lakewood Chrysler-Plymouth, Inc. was engaged in a business requiring a great deal of very expensive advertising. The overhead of a motor home business and of an automobile dealership have no demonstrable relationship, and to say that officers' and managers' salaries of a company doing $11-million in business should be the same as those of a company doing $176,000 defines credulity.

The IRS has wide discretion, but discretion is not to be equated to fiat. The practicalities of business life cannot be ignored just to restructure legitimate business enterprises in a way which will produce more tax revenue. I think it entirely reasonable that successful businessmen didn't want to risk the credit of a successful dealership with the risks of an untried business. Roger Mauro, Inc. was entering an experimental field. That it was permitted to occupy a corner of the dealership lot without payment of rent doesn't shock my conscience. This is not a situation in which the expenses and overhead of Lakewood Chrysler-Plymouth were increased one cent by letting the new company occupy unused space and by having Lakewood Chrysler-Plymouth officers give a little of their spare time to the motor home experiment. The expenses of Lakewood Chrysler-Plymouth weren't increased at all because of the activities of Roger Mauro, Inc., and to claim a right to siphon some of those expenses away from the company which incurred them just to lessen its lawful deductions is arbitrary. Legitimate corporate entities can't be ignored, and there was legitimate business purpose for the separate corporations. Although Roger Mauro, Inc. had less expense than it would have had were it not for Lakewood Chrysler-Plymouth, Inc., and, thus, Roger Mauro, Inc. had more income, there is no basis for saying that the expenses of the auto dealership were increased one cent under the working arrangement.

Not argued in the briefs are two opinions [both in the same case] which I concede are not directly in point on the facts, but which I think philosophically support plaintiffs' position in this case. I am thinking about Judge Breitenstein's opinion in *First Security Bank of Utah v. Commissioner of Internal Revenue,* (1971) 10 Cir., 436 F.2d 1192, and to the Supreme Court's affirmance of that case in *Commissioner of Internal Revenue v. First Security Bank of Utah,* (1972) 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318. The law prohibited banks from engaging in the insurance business. The banks for business purposes wanted loans secured by life insurance, and they operated through related corporations to write the insurance. Utilizing Sec. 482, the premium income was reallocated to the banks. Judge Breitenstein said:

"The test to be applied is whether the banks' income with respect to the borrowers' purchase of credit insurance was other than it would have been had the banks in the conduct of their affairs been an uncontrolled taxpayer dealing at arms' length with another uncontrolled taxpayer."

Factually, the cases differ, but the test of differing incomes means that since there is no showing that Lakewood Chrysler-Plymouth's expenses changed, there is no showing that the net income was different. Later, Judge Breitenstein commented that:

"(T)heir [the banks] participation required minimal effort and negligible cost compatible with the added protection which they secured for loan payment and they had no underwriting risk."

Exactly the same thinking is here applicable. The effort required of Lakewood Chrysler-Plymouth officers was minimal, and there was no real cost to it to protect the business of the established dealership. Of course, there was no statutory prohibition saying that Lakewood Chrysler-Plymouth couldn't get into the motor home business, but there were sound business reasons creating an equivalent prohibition. Manufacturers don't enthuse about franchised dealers selling unknown products. Good business judgment doesn't permit gambling an established business against an unproven venture.

Justice Powell wrote the affirming opinion in *First Security,* and he stressed that there was a prohibition against receipt of the income and that the income was never received by the banks. Here, the allocated expenses were never incurred by Roger Mauro, Inc. because the expenses of Lakewood Chrysler-Plymouth, Inc. were identical to the expenses it would have had if there were no Roger Mauro, Inc. or if Roger Mauro, Inc. were owned by unrelated persons and operated in another city. The reallocation attempted here was unsupported and unsupportable. It was arbitrary, and it cannot stand.

3. The $17,500 paid to Grand Prix, Inc. as a loan or a capital contribution.

■ Grand Prix started as a Fiat dealership owned half by Roger Mauro and half by plaintiffs. World Leasing was owned by the stockholders of Lakewood Chrysler-Plymouth and by one Merle Watson. Dissension arose among the stockholders, and World Leasing was merged into Grand Prix over the objection of Watson. Grand Prix started with an original invested capital of $2,500, and later, East Side Auto "loaned" $15,000 to Grand Prix. Half of the $15,000 was attributed to Roger Mauro and the other half was credited to plaintiffs. The entire $17,500 came from a loan from the mother-in-law of plaintiff Gold. The only Grand Prix stock issued was charged to the $2,500 capital investment, but no promissory notes were ever issued for the $15,000. Actually, the entire $17,500 was first carried on the books of Grand Prix as capital investment, but the entries were later changed to show the $15,000 as a loan. The government says that when the $15,000 was repaid, it was a distribution of capital and was not repayment of a loan. Under present Treasury Regulations plaintiffs would be hard put to even argue against the determination under Section 385 that the entire $17,500 was capital contribution. However, the present regulation really just summarizes the prior case law, and if ever there were a thin corporation, Grand Prix was one. Taxpayers fail the tests applied to decide whether the advances were loans or capital contributions. There was never any written evidence of indebtedness and the ratio of debt to equity was such that to treat the $15,000 as a loan would be to ignore reality. The substantial economic reality of this advance is that the parties were contributing much needed capital, and the determination by the IRS on this issue was reasonable and fully supported.

In summary, then, I find in favor of the taxpayers on the Redwell Prospect issue and on the Reallocation of Lakewood Chrysler-Plymouth expenses, but I find in favor of the government on the third issue—the Grand Prix loan vs. capital contribution dispute.

Rule 58 says, "Attorneys shall not submit forms of judgment except upon direction of the court, and these directions shall not be given as a matter of course." I do not give such directions routinely, but because of the complexities of the arithmetic with which we are dealing and because of the familiarity of counsel with that arithmetic, I direct

that a form of judgment be submitted within 15 days consistent with the rulings in this opinion. Hopefully, without waiver of their appellate contentions, the parties can agree on a form of judgment, but, if they can't, each side should submit a proposed judgment taking care of the dollar amount of the refund to be paid to taxpayers and interest to be awarded. Costs shall be borne equally by the parties.