T.C. Memo. 1997-499


UNITED STATES TAX COURT


BERGER CHEVROLET, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

TIMOTHY M. & HELEN L. PETTY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5882-96, 16336-96.        Filed November 6, 1997.


Ray Foresman, for petitioners.

Elizabeth Patino, for respondent.


MEMORANDUM OPINION

RAUM, Judge:  The Commissioner determined deficiencies in
petitioners' Federal income taxes as follows:

| Petitioner | Year | Deficiency |
|------------|------|------------|
| Berger Chevrolet, Inc. | 1990 | $13,087 |
| Timothy and Helen Petty | 1987 | 21,908 |

The issue is whether, on the facts set forth hereinafter, commissions paid to a car dealership's finance and insurance manager for selling credit insurance are ordinary and necessary business expenses of the dealership deductible under section 162(a)[1]. The case was submitted on the basis of a stipulation of facts.

Petitioners are Timothy M. and Helen L. Petty and Berger Chevrolet, Inc. (Berger). The Pettys, husband and wife, lived in Ada, Michigan, when their petition in this case was filed. They filed joint returns for the years involved. Berger was located in Grand Rapids, Michigan, when its petition in this case was filed.

Timothy Petty is the sole shareholder of Classic Chevrolet, Inc. (Classic), an S corporation. The Petty deficiency for 1987 is the result of the disallowance of deductions for commissions paid by Classic to its employees in 1989 and 1990.[2] The Berger deficiency is the result of the disallowance of deductions for commissions paid in 1990. Unless otherwise indicated, the following events occurred in 1989 and 1990 in the case of Classic, and 1990 in the case of Berger.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

[2] As a result of the disallowances, Classic's net operating losses for 1989 and 1990 were reduced. Consequently, the net operating loss carryback to 1987 was correspondingly adjusted, resulting in the deficiency.

Classic and Berger are Michigan motor vehicle dealerships, licensed as new motor vehicle dealerships by the Michigan Department of State. They are also licensed as "installment sellers" by the State of Michigan, Financial Institutions Bureau. An installment seller is authorized by the Michigan Motor Vehicle Sales Finance Act to enter into installment sales contracts with any of its customers who desire and qualify for financing.

Installment sales contracts are written by dealers on behalf of a variety of financial institutions and assigned to the financial institution without recourse against the dealer. Dealers use the financial institution's forms when arranging the financing. When a buyer of a motor vehicle finances the vehicle, the buyer completes a credit application. After the buyer's credit is approved, the buyer enters into an installment sale purchase agreement for the vehicle. The installment sale purchase agreement is immediately assigned to the financial institution through which the dealer has arranged financing. Upon assignment, the dealer receives payment from the financial institution for the installment sale purchase agreement that was assigned to it.

During 1990, Classic sold a total of 3,112 new and used motor vehicles; 1,888 of those vehicles were financed with dealer-arranged financing. Classic received gross income from dealer-arranged financing of $280,529. Berger sold a total of 5,290 motor vehicles; 2,561 of those were financed with dealer-

arranged financing.  Berger received gross income from dealer-arranged financing of $261,926.

Virtually all new motor vehicle dealers in Michigan and other states offer credit life and disability insurance (credit insurance) to their customers who buy vehicles with dealer-arranged financing.  Credit insurance is also available from banks, credit unions, and other lenders.  Credit insurance is available to installment buyers under the age of 70 years without a physical examination, provided the buyer's answers to a health questionnaire are satisfactory.

To purchase credit disability insurance, the buyer must be actively employed and not on leave at the time of application for the insurance.  Benefits from the credit insurance policies, in the event of disability or death, are payable to the financial institution that holds the installment sale purchase agreement, not the buyer.  Benefits that exceed the outstanding indebtedness, if any, are payable to the second beneficiary or the estate of the buyer.  Disability payments are prorated for each day the buyer is disabled and paid to the creditor up to a maximum of the full monthly vehicle installment payment.  Only the buyer, not any co-obligor, is eligible for disability insurance.

Credit life and credit disability programs are written as group policies in which the buyer enrolls, rather than as individual policies.  The group policy is issued to the dealer.

The group policy explains the insurance coverage in detail. When insurance is issued to a buyer he receives a certificate of enrollment. The certificate contains an outline of the benefits included in the group policy.

To provide credit insurance to its customers, Classic contracted with Western Diversified Life Insurance Company (Western). Western issued certain group credit insurance policies to Classic. Berger contracted with American Way Life Insurance Company (American Way). American Way issued certain group credit insurance policies to Berger.

Installment buyers may finance the cost of credit insurance as part of the installment sales contract. If financed, the premiums for credit insurance are included as a specific item in the contract. Berger and Classic each collected the full insurance premium as part of the remittance from the financial institution after assignment of the installment sale agreement to that financial institution. In 1990, Berger and Classic made a single remittance each month of all premiums they collected to Western and American Way, respectively. The dealers did not retain any portion of the premiums and were not reimbursed by either Western or American Way for any of their direct or indirect costs in connection with offering and marketing group credit insurance.

Western paid a commission on each premium collected by Classic to the Woodcliff Agency, Inc. (Woodcliff), a duly

licensed insurance agency in Michigan.  Woodcliff is an S corporation whose sole shareholder and director was petitioner Helen L. Petty.  Woodcliff's sole income was the commissions received from the sale of credit insurance under Classic's group policy.  Woodcliff's sole expenses were for accounting fees. Woodcliff did not have any employees.

American Way paid a commission on each premium collected by Berger to the Corsa Agency, Inc. (Corsa), a duly licensed insurance agency in Michigan.  Corsa is a subchapter S corporation whose shareholders were R. Dale Berger, Sr., and Lynn Berger, each of whom held 50 percent of the stock.  R. Dale Berger Sr. is Matt Berger's grandfather.  Lynn Berger is Matt Berger's wife.  Matt Berger held 16 percent of the stock of Berger.  The remaining 84 percent was held by R. Dale Berger, Jr. The stipulation of the parties does not disclose the relationship between Matt Berger and R. Dale Berger, Jr.  Corsa received $510,163 from the sale of credit insurance under Berger's group policy.  Corsa's sole income was the commissions received from the sale of credit insurance under Berger's group policy. Corsa's sole expenses were taxes, professional fees, and administrative fees which totaled less than 10 percent of Corsa's gross income.  Corsa did not have any employees.  Woodcliff and Corsa are referred to as "dealer-related agencies" by the State of Michigan Financial Institutions Bureau because such agencies are established for the purpose of selling credit insurance to a

single dealership or related dealerships and are normally owned by a relative of the shareholders of the dealership.

For the entire year of 1990, Berger and Classic each employed a finance and insurance manager and certain salespersons. The responsibilities of the managers and salespersons included offering group credit insurance to installment buyers. If an installment buyer purchased credit insurance, the manager and/or salesperson calculated the amount of the premiums, completed insurance disclosures on the installment sale contract, obtained the buyer's signature, explained the coverages, ensured that enrollment certificates were provided to the buyer, and documented the transaction for Western or American Way.

Berger paid manager commissions of $38,490 for selling credit insurance. Classic paid manager commissions of $26,060 in 1989 and $29,025 in 1990 for selling credit insurance. Neither Berger nor Classic paid commissions to salespersons other than managers for selling credit insurance.

Under Michigan law, motor vehicle installment sellers are prohibited from receiving, directly or indirectly, any portion of the credit insurance premiums. Mich. Stat. Ann. sec. 23.628(31) (Law. Co-op. 1991). Because of this law, insurance agencies were created to collect the commissions paid by the insurance companies. Such agencies, although closely related to the dealerships, were legally separate from them under Michigan law.

Realistically, however, the sale of credit insurance is part of the dealership's function. Dealerships perform a variety of services, including selling cars, arranging financing, and fulfilling warranty obligations as defined in service contracts. Among these services, offering credit insurance is a subservice of arranging financing.

Credit insurance is offered on the installment sale purchase agreement filled out by employees of the dealerships. Since the installment agreement offers credit insurance, the dealerships, through their employees, must be able to explain the purpose of credit insurance and calculate its cost. Moreover, the dealers collect payment for credit insurance when the dealer-arranged financing is completed. Although the commissions paid by the insurance companies are paid to the dealer-related agencies, it is clear from the record that the dealerships earn such commissions. And those commissions are paid to the dealer-related agencies only because Michigan law mandates that result. However, the agencies have no employees and take no initiative in selling the credit insurance. The only role the dealer-related agencies play is as repositories of commissions paid by the insurance companies. There is nothing in the record to indicate that the agencies played any part whatsoever in earning the commissions paid to them. The agencies are owned (directly or indirectly, e.g., through a corporation) by relatives of the dealerships' owners with the result that the dealerships'

earnings go to, or for the benefit of, the natural objects of the owners' bounty.

Because the earnings of the dealerships are diverted to the dealer-related agencies, it may be questioned why the Commissioner did not impute the agencies' earnings to the dealerships.  In Lucas v. Earl, 281 U.S. 111 (1930), the Supreme Court held that income must be taxed to the person who earns it; see Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949) ("the first principle of income taxation:  that income must be taxed to him who earns it").  However, the Commissioner did not take that approach here.[3]  Instead, the Commissioner denied the dealerships' deductions for commissions paid to their managers on the theory that the commissions are an expense of the dealer-related agencies.

The record is clear that the dealerships, not the insurance agencies, in fact offer credit insurance, notwithstanding that under Michigan law the dealerships are not permitted to receive commissions for selling credit insurance and that in accord with Michigan law the commissions are channeled to their related insurance agencies.  However, the issue presented to us by the pleadings is not whether the commissions[4] paid by the insurance

---

[3] Conceivably, the Commissioner may have been deterred by Commissioner v. First Security Bank, 405 U.S. 394 (1972).

[4] Unfortunately, the word "commissions" is used in two different contexts with potential for confusion:  (1) Commissions paid by the insurance companies for the sale of policies, which
(continued...)

companies should be included in the gross income of the dealerships, but rather whether the dealerships are entitled to deduct under section 162(a) the commissions that they paid to their managers for selling credit insurance.

The Government urges us to decide in its favor on the ground that the compensation (or commissions) paid to the dealerships' managers for selling the credit insurance is not deductible under section 162(a) as claimed by petitioners. In that posture of the case, we hold for petitioners that such compensation (or commissions) is deductible as a business expense under section 162(a).

Section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". An ordinary expense is one that is "normal, usual, or customary" in a particular business, even if it occurs only once. Deputy v. du Pont, 308 U.S. 488, 495 (1940). "One of the extremely relevant circumstances is the nature and scope of the particular business out of which the expense in question accrued." Id. at 496. A necessary expense is one that is "appropriate and helpful." Welch v. Helvering, 290 U.S. 111, 113 (1933). Whether the expense meets the

_____

[4](...continued)
they paid to the dealer-related agencies; and (2) commissions paid by the dealerships to their managers for their role in the sale of insurance.

requirement of being ordinary and necessary is a question of fact.  <u>Id.</u> at 115.

A dealership's business encompasses a wide range of activities beyond the mere sale of a vehicle.  The arrangement of financing of sales on an installment plan is a familiar aspect of a dealership's business and the offer of credit insurance with respect to such sales is proximately related thereto.  Of the 3,112 new and used cars purchased from Classic, 1,888 were financed with dealer-arranged financing.  Of the 5,290 cars sold by Berger, 2,561 were financed with dealer-arranged financing.  With each car financed, the dealer uses the financial institution's installment sales contract forms.  Of four installment sales contracts in the record, all offer the option of credit insurance.  Credit insurance is not always purchased by the customer and is available for purchase elsewhere.  Nevertheless, it is clear from the record that both the dealerships and the financial institutions expect someone at the dealership to be able to explain and offer credit insurance to the customer while the customer is filling out the installment sale purchase agreement.

The commissions for credit insurance are an "ordinary" expense.  The parties have stipulated that virtually all new motor vehicle dealerships in Michigan and other states offer credit insurance to their customers who finance their automobiles.  We have noted that the offering of credit insurance

on the installment agreement requires its explanation by a salesman or a manager. And it seems clear that a dealership offering credit insurance would take such service into account in some manner in compensating an employee for explaining to customers the nature of the insurance coverage and calculating its cost for customers, as well as arranging for the financing of the very cost of the credit insurance itself.

The expenses are also "necessary". As we have noted, virtually all motor vehicle dealerships offer credit insurance. And, as we have also noted, the installment sale purchase agreements offer the option for credit insurance. To keep up with their competitors, and to offer one stop service for financing, the dealerships must have employees who can explain the function of credit insurance to customers and who are able to calculate the premiums. Paying commissions to the managers is an "appropriate and helpful" step in achieving those objectives. Cf. Nichols Loan Corp. v. Commissioner, 321 F.2d 905 (7th Cir. 1963), revg. T.C. Memo. 1962-149.

The Government relies on an artificial distinction between the dealerships and the related agencies. According to the Government, the compensation (or commissions) paid to the managers constitutes an expense of the dealer-related agencies, not of the dealerships. Accordingly, the argument continues, the dealerships are not entitled to a deduction unless they can show that compensating the managers results in a direct and tangible

benefit to the dealerships. The Government further contends that the dealerships are not in the insurance business and should not be allowed to deduct insurance expenses.

First, the Government is mistaken in treating the dealerships and the dealer-related agencies as separate, autonomous organizations. As we indicated earlier, the dealerships provide the service of offering, explaining, and calculating credit insurance. The agencies have no employees and are merely shadow entities; they do not in fact sell insurance. The agencies receive the commissions on the premiums, but that result is required by Michigan law. To be sure, Michigan law governs as to the rights created and the relationships involved, but Federal law is determinative as to tax consequences. Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940). See United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985); United States v. Mitchell, 403 U.S. 190, 197 (1971); Bank One Ohio Trust Co., N.A. v. United States, 80 F.3d 173, 175 (6th Cir. 1996); Estate of Agnello v. Commissioner, 103 T.C. 605, 614 (1994).

Second, the Government contends that the dealerships should be denied the deductions because they are not in the insurance business. The Government fails to recognize the dealerships' role in fact in the sale of credit insurance and in that connection the breadth of a dealership's business. A motor vehicle dealership does much more than merely sell vehicles. Among other things, it arranges for financing of installment

sales and offers credit insurance in respect of such sales. Although the dealerships are not engaged generally in the insurance business, they do deal with credit insurance to the limited extent that it relates to dealer-arranged financing. As the record indicates, credit insurance is a small but nevertheless an integral part of a dealership's business. As a result, the manager commissions are an ordinary and necessary expense of the dealerships.

<u>Decisions will be entered
for petitioners</u>.